J. Patrick Delince  **JUDGE KARAS**        **07 CV       6722**
DELINCE LAW PLLC
44 Wall Street, 10th Floor
Tel: 212 710-9512
Counsel for the Plaintiff
(Bar Roll No. JD5795)



**UNITED STATES DISTRICT COURT SOUTHERN
DISTRICT COURT OF NEW YORK**
------------------------------------------------------------X

**GINA ESPOSITO**                               :
                                                :
                              **Plaintiff,**     :      **COMPLAINT**
                                                :
            - against -                          :      <u>**Jury Trial Demanded**</u>
                                                :
                                                :      **Index No.:**
**DEUTSCHE BANK AG**                             :
                                                :
                              **Defendant.**     :
------------------------------------------------------------X

Plaintiff, GINA ESPOSITO, complaining of the defendant, by her attorneys DELINCE LAW PLLC, alleges and avers as follows:

## <u>NATURE OF THE CASE</u>

1.      The plaintiff brings this employment discrimination seeking to remedy age discriminatory conduct and retaliation she suffered for opposing unlawful workplace practices while in the employ of defendant in violation of the terms, conditions and privileges of employment as protected by the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §621 *et seq.*; Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the New York State Human Rights Law ("NYSHRL"), NY Exec. Law, §290, *et seq.*; and the New York City Human Rights Law ("NYCHRL"), NYC Admin. Code § 8-101, *et seq.*

2.        GINA ESPOSITO has filed this lawsuit against DEUTSCHE BANK AG ("DEUTSCHE BANK") because it maintained a discriminatory workplace within which she was confronted by a glass ceiling that prevented her from attaining a promotion and receiving compensation commensurate with other younger employees engaged in substantially similar work, subjected her to a hostile work environment and permitted her to suffer retaliation for reporting behaviors of a subordinate that she reasonably believed to constitute discriminatory harassment—all of which contributed to bring about GINA ESPOSITO's constructive discharge from her employment.

3.        Initially, in 1998, GINA ESPOSITO commenced work at DEUTSCHE BANK as an outsourced consultant. In 1999, she was hired by Bernadette Whitaker, Director HR Shared Services, as a full-time permanent employee with the title of Assistant Vice President/Relocation Manager. This permanent position was within DEUTSCHE BANK's newly staffed International Services Department, which was to be headed by John Dall. During both periods of her employment at DEUTSCHE BANK, GINA ESPOSITO performed exceptionally well

4.        Within a week of her assuming her position within the new department, John Dall commenced to systematically create a hostile work environment intentionally designed to discourage her from continuing to work within his department. He also sought to staff his department with a younger team and indicated to GINA ESPOSITO that, as an older employee, she was "resistant to change."

5.        This hostile environment, created and perpetuated by John Dall, continued unabated during GINA ESPOSITO's employ at DEUTSCHE BANK.  It took

the form of gaslighting[1] warfare whereby GINA ESPOSITO's decisions were questioned and discredited.

6.    In August 2000, GINA ESPOSITO approached John Dall to speak with him concerning behavior that she reasonably perceived to constitute sexual harassment by a female staff member against a male employee. John Dall was dismissive, told her she was exaggerating the situation and that the problem was hers alone since she had hired the employee in question.

7.    Thereafter, GINA ESPOSITO twice discussed with Leslie Garfield, the newly installed HR person for the Human Resources Department, her concerns regarding the potential harassment in her department and also informed her of John Dall's reaction to those concerns.  After each instance, John Dall directed that GINA ESPOSITO have no further communication with Leslie Garfield.  GINA ESPOSITO felt physically threatened by his second warning.

8.    During her second meeting with Leslie Garfield, GINA ESPOSITO had sought advice concerning the harassment matter as well as discussed John Dall's constant berating and her fears that he would use her discussions with HR against her when it came time for bonuses and raises.  Leslie Garfield's response was "what do you expect? He's an accountant from Andersen and Salomon—he has no people skills."

9.    Soon thereafter, John Dall intensified the hostile work environment and commenced a retaliation campaign against GINA ESPOSITO.  John Dall's tactics

---

[1] "Gaslighting", coined from the 1944 film *Gaslight* and, as used herein, means a form of psychological abuse whereby the employer subtly, over time, seeks to hinder and diminish an employee's peace of mind and sense of security regarding her worth and status on the job, thereby making the conditions of her employment increasingly intolerable.

included, but were not limited to, consistent berating, snickering and whispering, increasingly questioning GINA ESPOSITO's decisions and expertise, alleging that she had ulterior motives for her business decisions, sadistically having her read, and then stand there as he discarded into his trash can, a complimentary letter written by an HR adviser regarding her work, and conducting an unprecedented seven hour performance review meeting with GINA ESPOSITO, unlike other department employees' reviews which were completed in less than thirty minutes.

10.     John Dall also denied GINA ESPOSITO a promotion and commensurate compensation increases while, at the same time, promoting her younger colleagues who performed similar work of no better quality. He justified the inequitable promotions of her peers by asserting DEUTSCHE BANK's policy was to promote with an eye toward potential future value versus rewarding employees for their past performance.

11.     John Dall also sought to reduce GINA ESPOSITO's duties and responsibilities in order to bolster the responsibilities of the other younger managers and the promotions they had received.

12.     By May 2001, the conditions of her employment had become so intolerable that, under extreme duress, GINA ESPOSITO involuntarily terminated her employment at DEUTSCHE BANK.

## JURISDICTION

13.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1332, 1343-(a) (4), 2201 and 2202. Jurisdiction over the New York State and City law

claims is further invoked pursuant to 28 U.S.C. §1367 and the Court's pendent

jurisdiction. GINA ESPOSITO hereby alleges that the amount in controversy exceeds the

sum of $75,000, exclusive of interest and costs attendant to the litigation.

14.    Venue is properly established in the Southern District of New York

pursuant to 28 U.S.C. §1391(b).


## PARTIES

15.    GINA ESPOSITO is a resident of the Borough of North Arlington,

Bergen County and State of New Jersey.

16.    Upon information and belief, DEUTSCHE BANK is an international

bank with its head office at Taunusanlage 12, 60262, Frankfurt am Main, Germany and

which maintains a branch at premises designated as 60 Wall Street, New York, NY,

10005-2858.

17.    Upon information and belief, DEUTSCHE BANK is conducting

business within the State of New York.

18.    DEUTSCHE BANK employs over five hundred persons within the

United States.

## FACTUAL BACKGROUND

19.    GINA ESPOSITO was born on November 4, 1954 and is currently 53

years of age.

20.    GINA ESPOSITO was employed by DEUTSCHE BANK from June 7,

1999 through May 3, 2001. She was 44 years old when her employment commenced and

46 when her employment terminated.

21.    In or about February 1998, Bernadette Whitaker, the Managing Director of Human Resources Shared Services at DEUTSCHE BANK, terminated all employees in a Human Resources Shared Services Department section known as the "International Services Department."

22.    Shortly thereafter, Bernadette Whitaker re-staffed the International Services Department by outsourcing the entire department to Arthur Andersen & Co. consultants, which was to be staffed and managed by Arthur Andersen consultants until she could hire permanent staffing for the department.

23.    The International Services Department functioned, *inter alia,* as a facilitator of employee staffing, compensation, payroll benefits, relocation, orientation as it relates to domestic and international assignments and policies of the country in which the employee was based or from which the employee originated.

24.    From March 1998 to June 1999, GINA ESPOSITO was retained by Arthur Andersen & Co. to work for DEUTSCHE BANK in its International Services Department as a Global Relocation Manager.

25.    As a Global Relocation Manager, GINA ESPOSITO's duties included administering DEUTSCHE BANK's domestic and international relocation policies.

26.    GINA ESPOSITO reported directly to other consultants who, in turn, reported to Bernadette Whitaker.

27.    During her employment as a consultant, GINA ESPOSITO received two excellent reviews. In her December 1998 review, it was noted that, in addition to her enthusiasm and good work ethic, GINA ESPOSITO's organizational skills were "flawless."

28.    The two reviews and the relationships she had established facilitated her subsequent retention as a permanent employee of DEUTSCHE BANK.

29.    In or about April 1999, Bernadette Whitaker, Director of Human Resources Shared Services, agreed to hire GINA ESPOSITO as a DEUTSCHE BANK permanent employee pending appointment of the new department head, John Dall.

30.    In or about May 1999, John Dall was installed as Director of Human Resources International Services Department and reported directly to Bernadette Whitaker.

31.    In June 1999, John Dall, carried out Bernadette Whitaker's directives to employ GINA ESPOSITO and, accordingly, John Dall met with GINA ESPOSITO and informed her that she would be paid a base salary of $75,000.

32.    GINA ESPOSITO's designated title was that of Assistant Vice President/Relocation Manager of the International Services Department.

33.    John Dall, who was directed to supervise GINA ESPOSITO, was several years her junior in age.

34.    In or about June 1999, within only a few days of becoming GINA ESPOSITO's supervisor, John Dall was verbally abusive towards GINA ESPOSITO.

35.    John Dall made it known to GINA ESPOSITO that he did not want her working in his department by telling her "you don't have your feet in too deep yet; why don't you consider leaving."

36.    John Dall's abuse frequently took the form of berating GINA ESPOSITO. Sometimes the verbal abuse would manifest itself subtly when he was communicating with her and, at other times, by chastising or reprimanding her in front of

others. He also called into question many of her decisions and actively sought to discredit them.

37.    John Dall's comments also reflected an age-based bias.

38.    When an older employee in her 50s left Deutsche Bank, John Dall commented that it was just as well because the employee was "older" and, presumptively, "resistant to change" and, therefore, dispensable.

39.    The words, "resistant to change" were John Dall's buzz words for too old.

40.    On a separate occasion, John Dall told GINA ESPOSITO that she was "resistant to change."

41.    John Dall sought to turn his department into one comprised of a young team.

42.    In hiring his staff, John Dall retained two younger people, Joanne Passiatore who was under 30 and Dan Richards who was approximately 32, to work in the International Services Department.

43.    John Dall fostered a "younger" work atmosphere within the department.

44.    John Dall invited and socialized with the younger workers outside of the office, but excluded GINA ESPOSITO from all such events and gatherings.

45.    GINA ESPOSITO was the only management level employee in the International Services Department over 40 years old.

46.    Both of her younger colleagues, initially held the same title, that of assistant vice president, as did GINA ESPOSITO.

47.    Joanne Passiatore, the Assistant Vice President of Expatriate Payroll, had previously worked for Salomon Smith Barney in its international department as a payroll clerk, was retained at an annual salary of approximately $80,000

48.    Although John Dall claimed that Joanne Passiatore had international tax skills, her work experience was that of a payroll clerk.

49.    Dan Richards, the Assistant Vice President of Expatriate Administration, was hired by DEUTSCHE BANK, was retained at an annual salary of $80,000.

50.    In contrast to GINA ESPOSITO's professional experience, Joanne Passiatore did not have any management experience as part of her prior jobs.

51.    GINA ESPOSITO had acquired managerial experience while working for Arthur Andersen & Co. In addition, at DEUTSCHE BANK, she had supervised three employees at DEUTSCHE BANK (Jessica Mailman, Sharon Lutzi and Kathyrn Baldwin), two of which GINA ESPOSITO had been involved in hiring.

52.    On the other hand, by 2001, neither Joanne Passiatore nor Dan Richards had supervised more than one person each.

53.    GINA ESPOSITO's duties and responsibilities also included strategic planning, including preparing a restructuring proposal for the department and other managerial planning proposals.

54.    Despite John Dall's desire to disregard them, he was forced to acknowledge GINA ESPOSITO's efforts. In her 2000 appraisal, he stated that:

> Gina was experiencing several problems with the outsource of the expense management. She approached me about bringing the responsibility in house based on her assessment that the work could be done better and more effectively by her team…Gina worked very hard and even weekends to implement. In so much she accomplished what she set out to do she did a great job.

55.    GINA ESPOSITO's position required technical tax skills, including, but not limited to, reporting various taxable/nontaxable expenses and for providing information contained in year-end W-2s, which required knowledge of the use of relocation software in order to prevent the occurrence of double deductions.

56.    GINA ESPOSITO's responsibilities included reporting, to payroll, all relocation costs, consistent with legal requirements and internal revenue regulations, at year end for inclusion on employee W-2 forms.

57.    GINA ESPOSITO was responsible for international relocations as well as domestic relocations of inpatriates, international student interns, expatriates and new hires.

58.    GINA ESPOSITO was also responsible for clearing up years of backlogged expenses, a responsibility neither of her two younger colleagues shared.

59.    GINA ESPOSITO was responsible for all relocation bills, including, but not limited to, writing checks and maintaining and balancing a business checking account, reconciling accounting, uploading information to the general ledgers, and paying and tracking contingent signing bonuses to new hires, duties that her younger colleagues did not share.

60.    In August 2000, GINA ESPOSITO informed John Dall that she believed one of her female staff members was engaged in sexually harassing male employees, illegal conduct that created an intimidating and offensive working environment.

10

61.     John Dall refused to offer any support or guidance. He told her "you hired her and she is your problem." He also told her that she was exaggerating the situation.

62.     Within days, GINA ESPOSITO discussed the sexual harassment issue with Leslie Garfield, the newly hired HR person for the Human Resources department, in order to obtain guidance on the matter and during which she discussed John Dall's reaction.

63.     When John Dall learned that GINA ESPOSITO had discussed the sexual harassment matter with Leslie Garfield, he told GINA ESPOSITO that she was never to discuss the matter ever again to anyone.

64.     At or about November 2000, GINA ESPOSITO returned to Leslie Garfield for more guidance on handing the potential harassment matter as well as GINA ESPOSITO's concerns of John Dall's constant berating her concerning the matter. He also discussed with Leslie Garfield her fears that John Dall would use her discussions with HR concerning the matter against her when it came time for bonuses and raises. Leslie Garfield's response was "what do you expect? He's an accountant from Andersen and Salomon—he has no people skills."

65.     This time, when John Dall found out that GINA ESPOSITO had again spoken to Leslie Garfield, he approached GINA ESPOSITO with physically agitated gestures near her face and said, "I don't ever want to see you in her office or hear from anyone that you've been in there." He also added, "do you really think what you say to Leslie is confidential? If that were the case should would be keeping secrets for all of HR." GINA ESPOSITO felt physically threatened by the encounter.

11

66.    Thereafter, John Dall intensified his efforts to create an even more hostile work environment, by retaliating against GINA ESPOSITO for having discussed what she perceived to be an unlawful practice by one of her staff members.

67.    At the end of November 2000, while department performance reviews meeting were conducted within half an hour, John Dall administered an unprecedented seven hour performance review, during a 2 day period, with GINA ESPOSITO. During the meeting John Dall continued his gaslighting efforts and sought to include complete falsehoods about GINA ESPOSITO's performance, some of which he begrudgingly changed by the end of the meeting. Her integrity was even questioned. Further, throughout the meeting, John Dall punctuated his comments "if you want to leave."

68.    John Dall increasingly berated GINA ESPOSITO on a daily basis. He would agree with her on something at one moment and then, purposely, gaslighting her by taking opposite stances within minutes or denying having said something when moments before he had unequivocally made such a statement. He told her that no one cared that she works long hours and on weekends. John Dall also would partake in snickering and whispering conversations with other younger employees while in GINA ESPOSITO's presence.

69.    Throughout all relevant time periods, John Dall treated GINA ESPOSITO's younger co-workers more favorably. John Dall gave her younger peers larger raises, bonuses, and promotions despite the fact that GINA ESPOSITO was more experienced, worked considerately more hours and performed as well as or better than either of her two younger colleagues.

12

70.    By January 2001, Joanne Passiatore and Dan Richards received bonuses of $55,000 each. In that same year, GINA ESPOSITO received a bonus of $30,000.

71.    Upon information and belief, Joanne Passiatore and Dan Richards each received salary increases of $20,000 each in 2001, whereas GINA Esposito received a salary increase of only $3,000 for that same year.

72.    The primary criterion for advancement and garnering favorable treatment in the International Services Department was that of being "young."

73.    John Dall informed GINA ESPOSITO that Don Jones, the head of Human Resources, had mandated a 4% to 6% salary increases for all Human Resources employees, however, GINA ESPOSITO's increase amounted to only 3.75% whereas during the same time period, Joanne Passiatore and Dan Richards each received 23% salary increases.

74.    After the inequitable promotions and salary increases, GINA ESPOSITO and her two colleagues continued to perform the same functions as they had been since all of them commenced work at DEUTSCHE BANK.

75.    In April 2001, GINA ESPOSITO discussed the promotions of Joanne Passiatore and Dan Richards with John Dall.  He advised her that DEUTSCHE BANK's policy with regard to promotions was based on future holds, not past performance or merit. GINA ESPOSITO reasonably understood this to mean, coming as it did from John Dall, that younger workers had a better future at DEUTSCHE BANK than did older workers.

76.    In fact, during that same conversation, John Dall told GINA ESPOSITO that her younger coworker's jobs were more important than was her position, despite that

13

fact that, at least until these promotions, all three of them had held similar positions with similar responsibilities.

77.    John Dall also campaigned to diminish and reduce GINA ESPOSITO's duties and responsibilities in order to bolster Joanne Passiatore and Dan Richard's responsibilities.

78.    Although GINA ESPOSITO inquired of John Dall regarding the possibility of future promotions for her at DEUTSCHE BANK, John Dall offered her no encouragement or hope that she would ever be promoted. Instead, Dall confirmed GINA ESPOSITO's belief that she would *never* be given any opportunity for advancement within DEUTSCHE BANK.

79.    John Dall continually subjected GINA ESPOSITO to a hostile and retaliatory work environment, while her younger counterparts enjoyed rewards and preferential treatment.

80.    On or about April 5, 2001, John Dall summoned GINA ESPOSITO to his office. During this meeting in John Dall's office, Dall had her read an email he had received from Janis Simat, the head of Human Resources Globe. The email letter was addressed to both John Dall and Bernadette Whitaker. It glowingly described GINA ESPOSITO as follows:

> John, Bernadette-
> At this time of reorganization within HR and the business. I feel it is really important for both of you to know what a tremendous job Gina Esposito had been doing with our team of 30+ that is transitioning from Baltimore to NY. Gina been a major source of security for them and helped to ease much anxiety about their transition to NY with timely and complete responses to their multiple inquiries. She has been instrumental in arranging for different vendors (real estate, shipping, and the schools consultant) to go down to Baltimore to speak to the group, and has kept me informed every step of the way about each individual situation. Gina

had gone out of her way to travel down to Baltimore several times to be on site to answer questions and have individual meetings with the employees. Above all, every interaction she had with the group is completely professional, courteous, and respectful of their situation. I know she has been putting in some very long hours working on this and her dedication is truly appreciated by myself and the Equities management team.

Just thought it would be nice to know in these unsure times what a star you have here. Please feel free to call me if I can provide more detail.

After GINA ESPOSITO had finished reading the email, John Dall took the email from her hands and, with a sadistic smirk on his face, threw the email into his wastepaper basket. GINA ESPOSITO reasonably understood John Dall's action to mean that she had no hope of advancement within DEUTSCHE BANK.

81.     By April 18, 2001, after a week of intense snickering and whispering by John Dall and the younger colleagues, it was noticed that John Dall had promoted both Joanne Passiatore and Dan Richards to Vice President positions. GINA ESPOSITO was not promoted.

82.     Based on John Dall's intolerable actions and insidious behavior, including, but not limited to his harassment, retaliation and repeated indications to GINA ESPOSITO that she had no real professional future with DEUTSCHE BANK, GINA ESPOSITO reasonably concluded that she had no reasonable expectation of career advancement in DEUTSCHE BANK and no reasonable expectation of fair treatment with John Dall and not surprisingly she reached a "breaking point" as the result his constant abuse.  As a result of the foregoing, GINA ESPOSITO felt compelled to resign from DEUTSCHE BANK effective May 3, 2001 and was constructively discharged as a consequence thereof.

15

83.     John Dall's reasons for promoting the other two younger employees at GINA ESPOSITO's expense were entirely spurious, contrived, fabricated and pretextual.

84.     Upon GINA ESPOSITO's departure from DEUTSCHE BANK, her duties were assumed by several younger persons while other responsibilities were outsourced.

85.     Prior to the commencement of this action, on or about February 6 2002, GINA ESPOSITO filed a Charge with the Equal Employment Opportunity Commission ("EEOC").

86.     By letter dated April 30, 2007, the EEOC issued a Notice of Right to Sue.

87.     A copy of this Complaint has been served on the New York City Commission of Human Rights Commission and the New York City Corporation Counsel.

## AS AND FOR A FIRST CAUSE OF ACTION

88.     GINA ESPOSITO  repeats, reiterates and realleges all of the allegations contained in above paragraphs numbered and designated as "1" through " 87", inclusive, as if set forth in full herein.

89.     DEUTSCHE BANK's treatment of GINA ESPOSITO while in its employ was motivated by discriminatory intent and was conducted on the basis of GINA ESPOSITO 's *age* in violation of the ADEA, 29 U.S.C. §621 et seq.; New York State Executive Law §290 *et seq.* and New York City Administrative Code §8-101 *et seq.*

90.     GINA ESPOSITO has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as the result

of DEUTSCHE BANK's discriminatory practices unless and until this Court grants her the requested relief.

91.    As a result of the foregoing, GINA ESPOSITO is entitled to the costs of this action together with reasonable attorneys' fees.

92.    As a result of the foregoing, GINA ESPOSITO is entitled to punitive damages in an amount to be determined at trial.

93.    As a result of the foregoing, GINA ESPOSITO is entitled to compensatory damages.

94.    As a result of the foregoing, GINA ESPOSITO is entitled to injunctive, declaratory and other equitable relief.

## AS AND FOR A SECOND CAUSE OF ACTION

95.    GINA ESPOSITO repeats, reiterates and realleges all of the allegations contained in above paragraphs numbered and designated as "1" through "87", inclusive, as if set forth full herein.

96.    DEUTSCHE BANK's *failure to promote* GINA ESPOSITO to position as Vice President within her department was motivated by discriminatory intent and such decision was made on the basis of GINA ESPOSITO 's *age* in violation of the ADEA, 29 U.S.C. §621 *et seq.*; New York State Executive Law §290 *et seq.* and New York City Administrative Code §8-101 *et seq.*

97.    GINA ESPOSITO has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as a result of DEUTSCHE BANK's discriminatory practices unless and until this Court grants her the requested relief.

98.    As a result of the foregoing, GINA ESPOSITO is entitled to the costs of this action together with reasonable attorneys' fees.

99.    As a result of the foregoing, GINA ESPOSITO is entitled to punitive damages in an amount to be determined at trial.

100.    As a result of the foregoing, GINA ESPOSITO is entitled to compensatory damages.

101.    As a result of the foregoing, GINA ESPOSITO is entitled to injunctive, declaratory and other equitable relief.

## AS AND FOR A THIRD CAUSE OF ACTION

102.    GINA ESPOSITO  repeats, reiterates and realleges all of the allegations contained above in paragraphs numbered and designated as "1" through " 87", inclusive, as if set forth in full herein.

103.    DEUTSCHE BANK GINA ESPOSITO by  creating a *hostile work environment* and because she was otherwise treated differently from similarly situated employees by DEUTSCHE BANK with respect to the terms, conditions and privileges of her employment in violation of the ADEA, 29 U.S.C. §§621 et seq.; Title VII of the Civil Rights Act, § 2000e, *et seq.* ("Title VII"); New York State Executive Law, §290 *et seq.* and New York City Administrative Code, §8-101 *et seq.*

104.    GINA ESPOSITO has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as a result of DEUTSCHE BANK's discriminatory practices unless and until this Court grants her the requested relief.

105.    As a result of the foregoing, GINA ESPOSITO is entitled to the costs of this action together with reasonable attorneys' fees.

106.    As a result of the foregoing, GINA ESPOSITO is entitled to punitive damages in an amount to be determined at trial.

107.    As a result of the foregoing, GINA ESPOSITO is entitled to compensatory damages.

108.    As a result of the foregoing, GINA ESPOSITO is entitled to injunctive, declaratory and other equitable relief.

## AS AND FOR A FOURTH CAUSE OF ACTION

109.    GINA ESPOSITO repeats, reiterates and realleges all of the allegations contained above in paragraphs numbered and designated as "1" through "87", inclusive, as if set forth in full herein.

110.    DEUTSCHE BANK by *retaliating* against GINA ESPOSITO for notifying her manager John Dall of what she reasonably and in good faith believed to be an unlawful employment practice in violation of the terms, conditions and privileges of her employment pursuant to Title VII of the Civil Rights Act,§ 2000e, *et seq.*; New York State Executive Law §290 *et seq.* and New York City Administrative Code §8-101 *et seq.*

111.    GINA ESPOSITO has and will continue to suffer monetary damages, irreparable injury, mental anguish and personal and professional humiliation as a result of DEUTSCHE BANK's discriminatory practices unless and until this Court grants her the relief requested.

112.    As a result of the foregoing, GINA ESPOSITO is entitled to the costs of this action together with reasonable attorneys' fees.

113.    As a result of the foregoing, GINA ESPOSITO is entitled to punitive damages in an amount to be determined at trial.

114.    As a result of the foregoing, GINA ESPOSITO is entitled to compensatory damages.

115.    As a result of the foregoing, GINA ESPOSITO is entitled to injunctive, declaratory and other equitable relief.

**WHEREFORE,** GINA ESPOSITO demands judgment against DEUTSCHE BANK:

(a)    awarding GINA ESPOSITO  the costs of this action together with reasonable attorneys' fees;

(b)    directing DEUTSCHE BANK to pay GINA ESPOSITO  punitive damages on GINA ESPOSITO 's first, second, third and fourth causes of action in an amount to be determined by the jury;

(c)    directing DEUTSCHE BANK to pay GINA ESPOSITO  compensatory damages on all of GINA ESPOSITO 's enumerated causes of action in the amount of $2,000,000 each;

(d)    directing DEUTSCHE BANK to place GINA ESPOSITO  in the same position she would have occupied but for the DEUTSCHE BANK's discriminatory treatment;

(e)    enjoining and permanently restraining DEUTSCHE BANK from ongoing discriminatory and unlawful employment against similarly situated employees.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, GINA ESPOSITO hereby demands a trial by jury on all claims so triable.

Dated: July 16, 2007
New York, New York

By: J. Patrick DeLince
DELINCE LAW PLLC
*Attorneys for GINA ESPOSITO*
44 Wall Street, 10th Floor
New York, NY 10005
Tel: (212) 710-9512
Fax: (212) 710-9513