Westlaw.

Not Reported in F.Supp.2d                                                                                              Page 1

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Farage v. Johnson-McClean Technologies, Inc.
S.D.N.Y.,2002.

United States District Court, S.D. New York.
Regina FARAGE, Plaintiff,
v.
Johnson-McClean TECHNOLOGIES, Inc. a/k/a
JMT, Inc. and Charles William Johnson,
Defendants.
**No. 01 CIV. 4856(LMM).**

May 29, 2002.

MEMORANDUM AND ORDER
MCKENNA, D.J.
*1 Plaintiff Regina Farage ("Plaintiff" or "Farage")
commenced this employment action against
Johnson-McClean Techonologies, a/k/a JMT, Inc. (
"Johnson-McClean" or "Company") and Charles
William Johnson ("Johnson") alleging: (1) gender
discrimination and retaliation under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e*et seq.,*
the New York City Human Rights Law ("NYCHRL"
), codified at N.Y.C. Admin. Code § 8-101*et seq.,*
and the New York State Human Rights Law ("
NYSHRL"), codified at N.Y. Exec. Law § 290*et
seq.;* (2) violations of the Family and Medical
Leave Act ("FMLA"), 29 U.S.C. § 2601*et seq.;* (3)
violations of New York Labor Law § 198 for failure
to pay wages and commissions; (4) breach of
contract and unjust enrichment; and (5) violations
of the Employee Retirement Income Security Act of
1974 ("ERISA"), 29 U.S.C. § 1132. Defendants
move for judgment on the pleadings pursuant to
Federal Rule of Civil Procedure 12(c) with regard
to the sex discrimination and retaliation claims and
two of the three ERISA claims.[FN1]For the reasons
set forth below, the motion is granted in part and
denied in part.

FN1. Defendants withdrew their motion

with regard to plaintiff's FMLA claim in
their Reply Brief. (Defs.' Reply Mem. at 6
n. 1.)

Background [FN2]

FN2. For the purpose of resolving this
motion, all facts are construed in favor of
the plaintiff.

Plaintiff was employed as an information
technologist by Johnson-McClean from
approximately January 1998 until her termination in
January 2000. Defendant Johnson is the founder
and Chief Executive Officer of the Company.
(Compl.¶ 4.) In December 1997, plaintiff and
Johnson-McClean entered into a written
employment contract which set forth specific terms
including her salary, commissions, 401K Plan, and
health benefits. (Id. ¶¶ 7-8 .)

Plaintiff alleges that shortly after she was hired,
Johnson began to sexually harass her. (Id.¶
10.)Specifically, "Johnson began a practice of
kissing plaintiff, on the lips, on a regular basis."(Id.)
According to plaintiff, this activity occurred
repeatedly during plaintiff's entire career at
Johnson-McClean. (Id.) Plaintiff rebuffed Johnson's
harassment and on a number of occasions told
Johnson that his conduct was inappropriate and that
it made her feel uncomfortable. (Id.¶¶
11-12.)Plaintiff claims that Johnson ignored her
concerns and continued kissing her in the
workplace. (Id.¶ 13.)

Plaintiff further alleges that in addition to the
kissing, Johnson would touch her on a regular basis
by grabbing her shirt or jacket near her breasts,
rubbing the material so that he brushed up against
her skin and commenting on the quality of the shirt's
fabric .(Id.) Plaintiff also claims that Johnson
continuously made inappropriate sexual comments
and that he would get up while plaintiff was sitting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
**(Cite as: Not Reported in F.Supp.2d)**

and gently grope his genitals in an attempt to arouse plaintiff. (Id.¶¶ 15-16.)

In addition to these allegations which plaintiff claims occurred continuously throughout the course of her employment, plaintiff has alleged a few isolated incidents in detail. In the first of these alleged incidents, which plaintiff refers to as "The Waterfront Incident," Johnson insisted that plaintiff meet him at his Manhattan apartment on a Saturday to discuss a work project. (Id.  ¶¶  18-19.)Upon her arrival, Johnson took her to brunch instead and " chatted with her about everything except business, asking plaintiff about whether she was in a relationship and why wasn't she married."(Id.¶ 20.)Plaintiff told Johnson that she was engaged and that she was there to discuss business only.(Id.¶¶ 21-22.)However, after brunch, Johnson led plaintiff to the waterfront at West 54th Street at which point, plaintiff again asked Johnson if they could discuss the work project. (Id.¶ 24.)Instead, Johnson talked only about his personal life and put his arm close to plaintiff as they sat on a bench at the waterfront. (Id. ¶¶ 25, 27, 28-30.)Finally, plaintiff left the Johnson at the waterfront. (Id.¶ 31.)Plaintiff alleges that Johnson never intended to discuss business that Saturday, but instead he "merely wanted to sow the seeds of romance and use plaintiff in a manner that her employment contract-and the law-did not permit."(Id.¶ 32.)

*2 The second incident, which plaintiff refers to as " The Secret Apartment," occurred a few months later when Johnson asked plaintiff to meet a client with him on a Sunday, despite plaintiff's protests that she was available during the week for such a meeting and that she had a planned family event that weekend. (Id.¶¶ 33-34.)Plaintiff consented because Johnson insisted that it was imperative and that it concerned consolidating the organizational structure of the Company. (Id.¶ 34.)Plaintiff met Johnson in the lobby of his apartment where the two briefly discussed one of the Company's clients. (Id. ¶ 35.)Johnson then took plaintiff in his car to a residential apartment where the doorman knew Johnson and which Johnson opened with his own key. (Id.¶¶ 36-37.)Soon after, plaintiff realized that this was not the client's apartment, but rather, Johnson's corporate apartment. (Id.¶ 38.)When

plaintiff asked about the client, Johnson replied, " Maybe you misunderstood." (Id.¶ 39.)Once Johnson failed to discuss business and began talking about his personal life, plaintiff told Johnson she had to go. (Id.¶ ¶ 43-44.)Johnson insisted that she ride with him in her car. (Id.¶ 45.)When they reached Johnson's parking garage, he invited plaintiff upstairs and drew close to kiss her. (Id.¶ 50.)However, plaintiff declined, extended her hand, blocked his advance and got out of the car. (Id.¶ 51.)

The third incident occurred at a pool party at a client's home which was attended by numerous Johnson-McClean employees. (Id.¶  51.)Plaintiff arrived at the party with some pastries, which she went to bring over to the host, who was standing with Johnson. (Id.) As she approached the host, Johnson walked toward her, put his arm around her, and said "Honey, you remembered to bring the pastries-thank you so much!"(Id.) At this point, he also gave her a kiss. (Id.) Plaintiff alleges that Johnson pursued her throughout the day.(Id.¶ 52.)For example, at one point while plaintiff was sitting with two other people, Johnson got out of the pool in his Speedo bikini, sat next to plaintiff, put one leg up on a chair, and exposed and lightly grabbed his crotch. (Id.¶ 54.)Plaintiff was disgusted and moved her seat. (Id.) But when one of the other people got up, Johnson moved over to sit next to plaintiff again to continue the alleged harassment. (Id.¶ 55.)This time, Johnson grabbed plaintiff's necklace in front of a group of people and said "Isn't this the necklace I bought for you?"(Id.) Plaintiff, shocked, appalled, and embarrassed, immediately responded, "No you've never bought me jewelry! My fiancé bought this for me!"(Id.¶ 56.)Johnson, however, kept insisting that he bought plaintiff jewelry to which plaintiff responded, "Bill you've never bought me jewelry and if you did I would never accept it."(Id.  ¶ 57.)The people around this scene expressed outrage and disgust at Johnson's actions. (Id.¶ 58.)

*3 In addition to these isolated incidents, plaintiff claims that Johnson "had a penchant for hiring women whom he found attractive and marketing them to clients on the basis of their physical attributes."(Id.¶  59.)The complaint lists examples

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
**(Cite as: Not Reported in F.Supp.2d)**

Page 3

of such behavior. (Id.¶¶ 60-64.)According to plaintiff, Johnson invited her to client-development meetings to "look pretty." (Id.¶ 65.)On these occasions, Johnson would comment to clients about how beautiful plaintiff was, which made plaintiff feel cheap. (Id.)

Johnson's alleged harassment continued and in November 1999, Johnson entered into a group meeting and kissed plaintiff in the presence of Jim Firlow ("Firlow"), Johnson-McClean's Chief Operating Officer and two other employees.(Id.¶ 66.)Plaintiff was enraged, and shouted to Firlow, " Enough is enough! You see what I am talking about! This has got to stop!"(Id.) Firlow responded, "I've been telling Bill for a long time that one day he's going to get himself in trouble legally and there will be no way out."(Id.¶ 67.)According to plaintiff, she complained to Firlow on numerous other occasions about Johnson's behavior. (Id.¶ 68.)Subsequently, Johnson kissed plaintiff again in December 1999 at which point plaintiff said to Firlow, "The next time this happens I'm taking legal action. This has to stop. There are legal ramifications for his behavior! It's appalling!"(Id.¶ 69.)

Within weeks after making this statement, plaintiff's employment was terminated. (Id.¶ 70.)Specifically, plaintiff received a letter dated January 31, 2000, in which the Company wrote, "as of January 15, 2000 you are no longer employed by JMT."(Id.)The letter states that the reason for her termination was "cost-containment." (Id.¶ 75.)Plaintiff contests that her termination was due to "cost-containment" because she had brought in so much business for the company. (Id.¶ 75.)In addition, plaintiff had been working between January 15, 2000 and January 31, 2000 but alleges that she was taken off the payroll as of the end of December 1999 and had not received her paycheck for January. (Id.¶¶ 71.)

Upon receipt of the letter, plaintiff immediately called Firlow who said to plaintiff, "You know this wasn't my doing."(Id.) Firlow told plaintiff that he could not dispute her good work performance, and that two managers from a client had called on numerous occasions to compliment plaintiff's

work.(Id.) Firlow also told plaintiff that "Bill will hold on to the people that are loyal to him" and that plaintiff was loyal to the rest of the firm "but to [Johnson]-you know what he thinks."(Id.¶ 72.)On February 10, 2000, plaintiff met with Johnson to discuss why her employment had been terminated.(Id.¶ 74.)His only response was that "I fell out of love with you."(Id.)

In addition to the claims of sexual harassment and retaliation, plaintiff alleges that the Company owes her: (1) at least $20,000 in commissions; (2) salary for the entire month of January; (3) $6,874.80 in vacation time; (4) $4,151 in overtime; and (5) $6,540 in reimbursement for medical expenses and health insurance premiums. (Id.¶ 76.)Further, with regard to plaintiff's 401K plan, plaintiff alleges that defendant did not match contributions for all of the year 1998 until sometime in 1999 after protests. (Id. ¶ 77.)Thus, plaintiff lost money from that contribution because she was unable to benefit from a strong market in 1998.(Id.) In addition, plaintiff does not believe that the Company made contributions for 1999. (Id.¶¶ 77-80.)

*4 Plaintiff further alleges that the defendants violated the FMLA in the following manner. Plaintiff, after consulting with surgeons, needed to have surgery on both of her feet due to a serious bunion condition known as Hallux Valgus. (Id.¶ 81.)Plaintiff informed the Company that she needed the surgery, which involved three procedures to each foot, and four to six weeks on crutches after each operation. (Id.¶ 82.)She told the Company that the first procedure was scheduled for June 3, 1999.(Id.) However, on June 2, 1999, after all the arrangements had been made, Firlow told plaintiff that she would have to postpone the surgery until September in order to work on a Company project. (Id.¶ 84.)According to plaintiff, Firlow refused to listen to plaintiff's protests that she could not postpone the surgery until September because she had already made post-surgery arrangements and that her medical coverage was going to change and the surgery would then be more expensive.(Id.¶¶ 85-86.)Firlow told plaintiff that Johnson-McClean would provide her with up to $1000 for the added expense. (Id.¶ 86.)In September, defendants again refused to give plaintiff time off for the surgery and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
(Cite as: Not Reported in F.Supp.2d)

Page 4

plaintiff suffered serious consequences-she continued to have severe foot pain, her posture was altered, and now the foot surgery will not be covered in full. (Id.¶ 87.)

In addition, plaintiff claims that defendants violated the FMLA after plaintiff was in a car accident on November 23, 1999 because they refused to give her the minimum of time off her doctors said was necessary to recover from the accident. (Id.¶¶ 89-90.)Plaintiff suffered at least one torn rotator cuff , as well as neck and back injuries in the accident, and when she returned to work on a project upon Firlow's and Johnson's insistence, she was doing too much work for her condition and asked for more assistance on the project.(Id.¶ 91-92.)But according to plaintiff, Firlow and Johnson refused to provide more assistance and insisted that she do the work. (Id.¶ 92.)Moreover, the two denied her requests to work from home despite her excruciating pain. (Id.) This atmosphere continued throughout the course of the project and even after, with Firlow and Johnson pressing plaintiff to do more work than she could handle in her present physical state. (Id.¶¶ 93-104.)During the period when plaintiff worked under such conditions, she received great reviews from the clients and Firlow. (Id.¶ 105.)

Nonetheless, plaintiff was fired. On November 9, 2000 plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge with the New York Commission on Human Rights alleging sex discrimination and retaliation. (Defs.' Mot. to Dis. Ex. B.). This lawsuit ensued.

Discussion

A. 12(c) Legal Standard

The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that of a 12(b)(6) motion for failure to state a claim.*Patel v. Contemporary Classics of Beverly Hills,* 259 F.3d 123, 125 (2d Cir.2001). The Court must read the complaint generously accepting the truth of and drawing all reasonable inferences from

well-pleaded factual allegations.*Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir.1993) . A court should dismiss a complaint only "if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

B. Title VII, NYSHRL, and NYCHRL Claims [FN3]

> FN3. In light of the Supreme Court's recent decision in *Swierkiewicz v. Sorema,* 534 U.S. 506 (2002), defendants, in their Reply Brief, withdrew their substantive arguments for dismissal of these claims. (Defs.' Reply Mem. at 1-2.)

1. Statute of Limitations

*5 Under Title VII of the Civil Rights Act of 1964, it is an "unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."42 U.S.C. § 2000e-2(a)(1).Title VII explicitly requires that an EEOC charge be filed within 180 days of the alleged unlawful activity or 300 days after the alleged unlawful activity if the claimant has already filed a discrimination charge with a state or local equal employment agency. *Id.* § 2000e-5(e)(1). According to the Second Circuit, " [t]his requirement functions as a statute of limitations ... in that the discriminatory incidents not timely charged before the EEOC will be time-barred upon the plaintiffs' suit in district court." *Quinn v.. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998) (citations omitted).

Here it is not disputed that the 300 day period applies because a charge of discrimination was filed with the New York City Commission on Human Rights on November 9, 2000. In addition, plaintiff concedes that "she will not invoke Title VII protection for any events occurring before January

Not Reported in F.Supp.2d                                                                    Page 5

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
**(Cite as: Not Reported in F.Supp.2d)**

14, 2000," 300 days before she filed her charge.
(Pl.'s Mem. in Opp'n at 6.) Defendant's argument
that plaintiff "had notice of her termination by
December 31, 1999" and thus that her sex
discrimination and retaliation claims are
time-barred, is unavailing because there is nothing
in the Complaint indicating that plaintiff received
such notice. The Complaint clearly states that the
first time plaintiff became of aware her termination
was by a letter dated January 31, 2000. (Compl.¶
70.) Therefore, plaintiff's Title VII claims are not
time-barred with regard to plaintiff's termination,
which occurred within the 300 day limitations
period.

Under the NYSHRL and the NYCHRL, it is also
unlawful for an employer to discriminate against an
employee based on gender. N.Y. Exec. Law §
296(1)(a) (McKinney 2001); N.Y.C Admin. Code §
8-107(1)(a). Likewise, it is forbidden under the
NYHRL and the NYCHRL for an employer to
retaliate against an individual who has opposed the
discriminatory practices. N.Y. Exec. Law § 296(7);
N.Y.C. Admin. Code § 8-107(7). Defendants argue
that plaintiff's discrimination and retaliation claims
under the NYSHRL and NYCHRL are time-barred
in part. (Defs.' Mem. of Law in Supp. of Mot. for J.
on Pleadings at 9.) Under the NYCHRL and the
NYSHRL, a plaintiff suing for discrimination must
file a lawsuit within three years after the alleged
unlawful practice. *Quinn,* 159 F.3d at 765;N.Y .C.
Admin. Code § 8-502(d).

Plaintiff filed this lawsuit on June 4, 1998. Thus,
defendants argue that the events in the Complaint
prior to June 4, 1998 are time-barred. (Defs.' Mem.
of Law in Supp. of Mot. for J. on Pleadings at
10-11.) In response, plaintiff claims that the acts
prior to June 4, 1998 are not time-barred because
they are part of a continuing course of conduct, and
therefore, the date of occurrence " 'shall be deemed
any date subsequent to its inception up to and
including the date of its cessation" '. (Pl.'s Mem. in
Opp'n at 7) (citing N.Y.C.R.R. § 465.3(e)) Plaintiff
specifically states that she is not invoking the "
continuing violation" theory applied in Title VII
cases. (Id. at 9 n1.)

**\*6** The standards for analyzing discrimination

claims brought under the NYSHRL and the
NYCHRL, including continuing violations, are the
same as for those brought under Title VII. *Cruz v.
Coach Stores, Inc.,* 202 F.3d 560, 565 n. 1 (2d
Cir.2000); *Walsh v. Covenant House,* 664 N.Y.S.2d
282, 283 (N.Y.App.Div.1997) (noting that the only
difference between laws is that the NYCHRL
provides for the recovery of punitive damages).
Because the Court rejects plaintiff's attempt to use a
general continuing wrong theory because it is not
applicable in this employment discrimination case,
and the plaintiff does not claim reliance on the
applicable continuing violation theory, the acts
before June 4, 1998 are time-barred to the extent
plaintiff wishes to recover for damages on them.
That does not mean that the acts may not be used as
evidence to support her discrimination claims.

### 2. Claims against Johnson

The Court must decide whether plaintiff may
maintain her Title VII, NYSHRL and NYCHRL
claims against Johnson, to the extent that are not
time-barred as discussed above. The Second Circuit
has held that only employers, not individual
employees, can be held liable for Title VII
violations. *Tomka v. Seiler Corp.,* 66 F.3d 1295,
1313 (2d Cir.1995). Thus, both Title VII claims
(Counts One and Four) against Johnson are
dismissed.

As for the NYSHRL, the New York Court of
Appeals has ruled that a corporate employee cannot
be held individually liable in an employment
discrimination action unless he is shown to have an
ownership interest in the employer's business or the
authority "to do more than carry out personnel
decisions made by others."*Patrowich v. Chemical
Bank,* 483 N.Y.S.2d 659, 660 (1984). However, the
Second Circuit recently held that an individual "
who actually participates in the conduct giving rise
to a discrimination claim may be held personally
liable" because § 296(6) of the NYSHRL states that
it is unlawful discriminatory practice " 'for any
person to aid, abet, incite, compel or coerce the
doing of any acts forbidden under this article, or
attempt to do so." ' *Tomka,* 66 F.3d at 1317 (citing
N.Y. Exec. Law § 296(6)). New York courts post-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
**(Cite as: Not Reported in F.Supp.2d)**

*Tomka* are split on whether the Second Circuit correctly interpreted the aider and abettor law. Compare *Trovato v. Air Express Int'l,* 655 N.Y.S.2d 656, 657 (N.Y.App.Div.1997) (rejecting *Tomka* and concluding that finding "a co-employee liable as an aider and abettor would ignore the statutory and legal authority limiting the parties who may be sued for employment discrimination"); *Foley v. Mobil Chemical Co.,* 647 N.Y.S.2d 374, 380-81 (N.Y.Sup.Ct.1996) (same) *with Ahmed v. Compass Group,* 99 Civ. 10032, 2000 WL 1072299, at *5 (S.D.N.Y. Aug. 3, 2000)(relying on *Tomka* 's conclusion); *Steadman v. Sinclair,* 636 N.Y.S.2d 325, 326 (N.Y.App.Div.1996) (same). The New York Court of Appeals has not ruled on this issue.

Here, plaintiff's allegations are sufficient to support a claim against Johnson under the NYSHRL regardless of which standard is applied. Under the *Patrowich* standard, plaintiff has adequately alleged that Johnson has control over personnel decisions. (Compl.¶¶ 71-74.) Under the *Tomka* standard, which the Court is bound to follow, plaintiff has alleged that Johnson was the main participant in the sexual harassment and the sexual discrimination. (Compl.¶¶ 10-88.) Therefore, plaintiff's discrimination and retaliation claims may go forward under the NYSHRL. The same analysis applies to plaintiff's claim under the N.Y.C. Admin. Code, which has an identical aider and abettor provision to the NYSHRL, N.Y.C. Admin. Code. § 8-107(6).*Ettinger v. State Univ. of N.Y. State College of Optometry,* 95 Civ. 9893, 1998 WL 91089, at *10 (S .D.N.Y. Mar. 2, 1998). Thus, plaintiff's claims against Johnson under the NYCHRL may also go forward.

### C. ERISA Claims [FN4]

> FN4. Plaintiff concedes that, based on the facts in her complaint, she brings ERISA claims only against the Company, not Johnson. (Pl.'s Mem. in Opp'n at 3.)

*7 Defendants further moves to dismiss two of plaintiff's three ERISA claims (Counts Eleven and

Twelve) as time-barred. Under 29 U.S .C. § 1113:
[n]o action may be commenced ... with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part after the earlier of -
(1) six years after (A) the date of the last action which constitutes a part of the breach of violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or
(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.

29 U.S.C. § 1113. Thus, an ERISA "suit must be commenced within three years after the plaintiff acquires actual knowledge of the breach, with an outside limit of six years after the breach."*Harris Trust and Savings Bank v. John Hancock Mut. Life Ins. Co.,* 122 F.Supp.2d 444, 463 (S.D.N.Y.2000). The Second Circuit has held that "actual knowledge " in this provision means "knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the Act."*Caputo v. Pfizer, Inc.,* 267 F.3d 181, 193, 194 (2d Cir.2001)(rejecting a constructive knowledge standard)."[A] plaintiff need not have knowledge of the relevant law ... [but] he must have knowledge of all facts necessary to constitute a claim."*Id.* (citation omitted). Defendants bear the burden of establishing that plaintiff had actual knowledge. *McDonell v. Costigan,* 00 Civ. 4598, 2002 WL 313528, at *7 (S.D.N.Y. Feb. 2, 2002). Thus, under the standard, defendants must show "that plaintiffs knew not only of the relevant events that occurred, but also that those events supported a claim for breach of fiduciary duty or violation under ERISA."*Id.* (citing *Caputo,* 267 F.3d at 193) ("The disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of an underlying claim.").

In this case, defendants argue that plaintiff had actual knowledge of the alleged ERISA violations because she made "repeated protests" in 1998 that the Company was not matching her 401K contributions. (Compl.¶ 77). However, defendants do not meet their burden of showing that plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 7

Not Reported in F.Supp.2d, 2002 WL 1067824 (S.D.N.Y.), 28 Employee Benefits Cas. 1973
**(Cite as: Not Reported in F.Supp.2d)**

had "actual knowledge" before June 4, 1998, three
years before this action was filed. The protests
might have been made after June 4th in the year
1998 and thus, the Court cannot dismiss these
ERISA claims as time-barred.

### CONCLUSION

In sum, the defendants' motion for judgment on the
pleadings is granted in part and denied in part. The
Title VII claims will go forward only against the
Company and only as to acts which occurred after
January 14, 2001. The NYSHRL and NYCHRL
claims will go forward against both defendants for
acts which occurred after June 4, 1998. The ERISA
claims will go forward against the Company. All
other claims alleged in the Complaint were not
challenged in this motion.

**\*8** So Ordered.

S.D.N.Y.,2002.
Farage v. Johnson-McClean Technologies, Inc.
Not Reported in F.Supp.2d, 2002 WL 1067824
(S.D.N.Y.), 28 Employee Benefits Cas. 1973

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.