LEXSEE 1997 US DIST LEXIS 12287

Caution
As of: Oct 11, 2007

**MASOOD GILANI, Plaintiff, -against- NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., Defendant,**

**96 CV 8070**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1997 U.S. Dist. LEXIS 12287*

**August 18, 1997, Decided**
**August 19, 1997, Filed**

**DISPOSITION:** [*1] NASD's motion to dismiss DENIED in part, and GRANTED in part.

**COUNSEL:** Aegis J. Frumento, Esq., Gary. A. Klein, Esq., SINGER ZAMANSKY LLP, New York, New York, for Plaintiff.

F. Joseph Warin, Esq., Douglas, R. Cox, Esq., Adam H. Offenhartz, Esq., Daniel Nelson, Esq., GIBSON, DUNN & CRUTCHER LLP, New York, New York, for Defendant.

John J. Flood, Esq., Associate General Counsel, NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC., Washington, D.C., Of Counsel.

**JUDGES:** SONIA SOTOMAYOR, U.S.D.J.

**OPINION BY:** SONIA SOTOMAYOR

**OPINION**

**OPINION AND ORDER**

**SONIA SOTOMAYOR, U.S.D.J.**

Pursuant to *Fed. R. Civ. P. 12(b)(1)* and *12(b)(6)*, defendant, the National Association of Securities Dealers ("NASD"), moves to dismiss the complaint of plaintiff, Masood Gilani ("Gilani"). For the reasons to be discussed, the Court grants the defendant's motion in part and denies the motion in part.

**FACTUAL BACKGROUND**

The following are allegations contained in plaintiff's complaint. Plaintiff Gilani, a 57 year old United States citizen of Iranian decent, claims that as a NASD employee, he was subjected to racial and national origin discrimination, and was retaliated against because of his complaints about [*2] racial discrimination. NASD employed Gilani as an examiner in the NASD's Special Investigations Unit from November 24, 1989 until September 19, 1995. Despite what Gilani described as a "good beginning" (Compl. PP 8-14), he started to experience racial discrimination in March of 1992 (Compl. P 15) when Kevin Devereaux ("Devereaux"), Gilani's white male supervisor, "unjustifiably" transferred most of Gilani's major investigations to a white female. (Compl. P 17). In or about August 1992 at Pinto's annual meeting with the district staff, Gilani questioned John Pinto, the NASD's Executive Vice President, about the lack of minority representation. The following workday, Devereaux and Michael Callahan, the Assistant Director,

told Gilani that he had embarrassed them and that he should never address the issue of racial discrimination with Pinto. Thereafter, Devereaux told Gilani in a threatening manner, "I'm going to make your life difficult." (Compl. P 21). In October 1992, Gilani was denied a bonus and was passed over for a promotion after being promoted the prior two years. (Compl. P 22).

In or about January 1993, Gilani requested a transfer to another group which was supervised by Hal [*3] Geller. (Compl. P 25). At the same time, Gilani met with Alden Adkins ("Adkins"), a Vice President with the NASD's General Counsel's Office, and told him that he believed he was a victim of racial discrimination. After completing a "thorough review," Adkins sent Gilani a memo stating that the NASD believed Gilani was entitled to a bonus based upon his performance for the year. Gilani, alleges, however, that "upon information and belief," the bonus was much lower than what was paid to other examiners in his division. (Compl. PP 27-28). In or about June 1993, after strong lobbying from Gilani, the NASD appointed Michele Sterling, an African-American woman, to be Gilani's new supervisor. (Compl. P 30). In or about August 1993, Pinto conducted his annual meeting with the district staff. Gilani again asked a question concerning minority issues. While refusing to answer Gilani's question, Pinto proposed the formation of a committee to discuss and investigate Gilani's concerns. (Compl. P 33).

In or about December 1993, Sterling promoted Gilani to the position of "Senior Compliance Examiner," and shortly thereafter, Gilani received a "large bonus." (Compl. PP 35-35). In or about February [*4] 1994, Gilani attended a meeting of the newly organized group that was to investigate his concerns on minority issues. Gilani revealed to Henderson, the chairman of the committee, his belief that the NASD was compensating white employees at a higher rate than minority employees. Gilani requested a comparative study, and Henderson agreed. (Compl. P 37). At the next meeting, Henderson presented the findings of the study which concluded that there was no disparity in compensation between minorities and non-minorities. In or about August 1994, at Pinto's annual meeting with the district staff, Gilani complained to Pinto that Henderson had discontinued the committee set up to investigate his concerns. Although Pinto told Gilani that he would investigate the charges, Pinto never communicated the results of any such investigation. (Compl. PP 42-43). At approximately the same time, Gilani suffered from a stress-related condition which was first believed to be a heart attack. (Compl. P 78). Beginning in September 1994, Gilani challenged both Sterling and Geller about potential regulatory mismanagement, and both Geller and Sterling responded by telling Gilani to "mind his own business." (Compl. [*5] PP 44-47 ).

In October 1994, Sterling passed Gilani over for promotion, claiming that while Gilani's work product remained the same, he "has ceased all communications with his supervisor," and has "disrupted a section meeting by characterizing the closure of one of his files as 'falsification' of records." (Compl. P 51). On August 24, 1995, Gilani filed a charge with the EEOC alleging that the NASD was guilty of retaliatory conduct in their failure to promote him because of his advocacy of minority rights. In a letter he received the following week, the EEOC stated that they would investigate the allegations and would notify the NASD of his complaint. (Compl. P 66). On September 7, 1995, Gary Lipkin, the Associate General Counsel of the NASD, acknowledged receipt of Gilani's EEOC charge. (Compl. P 67). On September 13, 1995, the NASD placed Gilani on probation. (Compl. P 68). On the same day, Gilani found an unmarked manila envelope listing the compensation of the NASD staff, and "discovered that other non-minority NASD examiners with the same experience and seniority as he had were earning 4% to 70% more than he was." (Compl. P 70). Finally, on September 19, 1995, the NASD fired [*6] Gilani, and he was escorted out of the building. (Compl. P 71-72).

Since his termination, Gilani claims that the NASD has "purposefully precluded him from finding employment by orally distributing information which it knows to be false and slanderous." (Compl. P 82). In or about February 1996, the Federal Bureau of Investigation ("FBI") contacted Gilani to question him about letters sent to the NASD anonymously threatening to bomb the NASD building. Although he was told that all former NASD employees were being interviewed, "upon information and belief" no other former employees were interviewed. (Compl. P 84).

On October 15, 1996, the EEOC issued Gilani a Notice of Right to Sue. Gilani terminated the EEOC investigation as a prerequisite to filing the instant complaint dated October 28, 1996. The judicial complaint includes the following causes of action: (1) racial

discrimination [1] and hostile work environment, (2) employment or retaliatory discrimination, (3) breach of contract, (4) tortious interference, (5) intentional infliction of emotional distress, (6) *prima facie* tort, and (7) libel per se. [2] Gilani requests compensatory damages in a sum in excess of ten million dollars. [*7]

1 Given Gilani's Iranian descent, the case at hand is in actually a hybrid race and national origin discrimination claim.

2 In Gilani's Memorandum in Opposition to Defendant's Motion to Dismiss, he withdraws his Libel Per Se claim and Tortious Interference claims because of the "difficulty in identifying specific third parties." Thus, plaintiff's Memorandum of Law does not address these two claims. Plaintiff informs the Court that he intends to amend his complaint after having an opportunity to explore these issues in discovery, and he will seek the Court's leave to replead them should discovery disclose the necessary facts.

In its motion to dismiss, the NASD contends that the complaint against it must be dismissed because Gilani has failed to state any cause of action for which relief can be granted under applicable federal or state laws. NASD claims that Gilani "was fired after a period of probation and repeated improper conduct." (Def. Mem. at 2). NASD maintains that "the last straw occurred when plaintiff [*8] obtained and disclosed confidential NASD salary information, a serious violation of NASD employee regulations, and itself an independent ground for termination." (Id.) Gilani counters that the complaint sets forth viable causes of action, but alternatively, he requests permission to replead under *Fed. R. Civ. Pr. 15(a)*, if necessary. (Pl.'s Mem. Opp. at 27.)

**DISCUSSION**

I. Standards for Motion to Dismiss Under *Rule 12(b)(6)*

In evaluating a motion under *Rule 12(b)(6)*, a court must accept as true all well-pleaded factual allegations in the complaint and must draw all inferences in favor of the pleader. See *Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993)*. Dismissal is proper only when "it appears beyond doubt that plaintiff can prove no set of facts in support of his or her claims which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. The trial court's function, is "merely to assess the legal feasibility of the complaint, and not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)*. Further, this [*9] principle is applied "with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)*.

II. Title VII Racial Discrimination and Hostile Work Environment Claims

NASD asserts that this Court does not have jurisdiction over Gilani's Title VII claims alleging racial discrimination and a hostile work environment because they were not included in the charge the plaintiff filed with the EEOC. The EEOC charge of discrimination specifically instructs the complainant to "check the appropriate box(es)" in order to aid the EEOC in identifying the causes of discrimination. Although Gilani could have checked multiple boxes, he only checked the retaliation box, and did not check the race or national origin box to define the basis of his alleged discrimination claim. In the "Particulars" section of Gilani's EEOC charge, he stated:

> I have been employed by respondent since 1989. Since 1992, I have repeatedly accused management of discriminating against non-Whites in various ways. As a result, respondent has retaliated against me in various ways as well.
>
> In the last 300 days, respondent has given me an unfair [*10] evaluation and denied me a promotion, pursuant to its retaliatory efforts against me. The adverse actions taken against me cited above are in violation of Title VII of the 1964 Civil Rights act, as amended.

The exhaustion of administrative remedies and the obtaining of a right to sue letter from the EEOC are necessary predicates to pursuing a Title VII claim in federal court. See *Alexander v. Gardner-Denver Co., 415 U.S. 36, 47, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974)*; *Holt v. The Continental Gp., 708 F.2d 87, 89-90 (2d Cir. 1983)*, cert. denied *465 U.S. 1030, 79 L. Ed. 2d 695, 104 S. Ct. 1294 (1984)*. The district courts have jurisdiction only over those claims that are included in an EEOC charge or that are "reasonably related" to the allegations in plaintiff's EEOC complaint." *Butts v. City of New York*

*Dep't of Housing Preservation and Devl't 990 F.2d 1397, 1401 (2d Cir. 1993)*. In Butts, the Second Circuit explored and defined the boundaries of the "reasonably related" test.

The plaintiff in Butts alleged in her EEOC charge that she was systematically discriminated against because of her race and sex in the terms and conditions of her employment. This [*11] was done, she claimed, by excluding her from meetings and duties to which her position should have entitled her, cutting her off from supervisors, defaming her, and discouraging her from applying for a higher position. In her judicial complaint, Butts added several specific allegations that were not recorded in her EEOC charge, including three racially discriminatory denials of promotion. Although Butts maintained that all her judicial claims were reasonably related to her EEOC charge, the Court determined that phrases in the EEOC charge such as "denied promotional opportunities based on my race and sex," lacked specificity and could not encompass the additional promotional claims alleged in her complaint. Further, the Court held that other phrases in Butts' EEOC charge such as "consistently been the target of discriminatory practices and treatment" from "October 1987 to the present" could not adequately enable the EEOC to investigate other specific discrimination claims in plaintiff's complaint. *Id. at 1403*. [3] As explained by the Second Circuit, "to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response to define the scope of the EEOC investigation [*12] and therefore predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated." Id. [4]

3 The Butts Court, however, did recognize plaintiff's claims which charged that she had been excluded from meetings to discuss ways to improve departmental efficiency. The Court viewed this claim as "reasonably related" to her EEOC charge alleging exclusion from reorganization meetings.

4 See also *Ong v. Cleland, 642 F.2d 316, 319 (9th Cir. 1981)* ("Allowing a federal court complaint to proceed despite its loose 'fit' with the administrative charge and investigation, however, is precluded if it would circumvent the Title VII scheme which contemplates agency efforts to secure voluntary compliance before a civil action is instituted"); *Ray v. Freeman, 626 F.2d 439, 442 (5th Cir. 1980)* (explaining that "judicial claims which serve to amplify, clarify, or more clearly focus earlier EEOC complaints are appropriate. Allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate"), cert. denied *450 U.S. 997, 68 L. Ed. 2d 198, 101 S. Ct. 1701 (1981)*.

[*13] Other courts in this circuit have refused to recognize allegations that lacked factual specificity because the "EEOC cannot be expected to investigate mere generalizations of misconduct, nor can defendants adequately respond to them." *Choi v. Chemical Bank, 939 F. Supp. 304, 313 (S.D.N.Y. 1996)*; see also *Chinn v. City University of New York Law School, 963 F. Supp. 218 (E.D.N.Y. 1997)* (holding that a "vague, general discharge of discriminatory conduct raised before the EEOC is not sufficient to trigger agency investigation of specific instances of discrimination alleged in the complaint").

The Choi Court recognized the one discriminatory denial of promotion alleged in the EEOC charge but did not recognize other failure to promote incidents. In Chinn the Court ruled that plaintiff's retaliation claims were not "reasonably related" to the race discrimination charge in the EEOC because he did not specify examples of retaliatory treatment, but solely reported instances of race discrimination. The Chinn Court further explained that:

> Title VII retaliation claims present both a new legal theory, namely retaliation, and new factual allegations . . . . Plaintiff's [*14] racial discrimination charge is separate and distinct from the retaliation allegations. Even under a broad, liberal reading of the EEOC charge, the reasonable scope of the agency's investigation could not be expected to encompass Chinn's allegations of retaliatory motive. *Id. at 223*; see also *McGuire v. U.S. Postal Service, 749 F. Supp. 1275 (S.D.N.Y. 1990)* (holding that plaintiff's EEOC charge of racially discriminatory dismissal could not encompass a retaliation claim plead in his complaint).

Retaliation, in contrast to race discrimination and

harassment, claims "represent an entirely distinct theory of liability," which cannot be viewed as "reasonably related" unless they are specifically included in an EEOC charge. *Acosta v. Yale Club of N.Y., 1995 U.S. Dist. LEXIS 14881, 1997 WL 600873*, at *7 (S.D.N.Y. 1995) (refusing to grant jurisdiction over plaintiff's race and gender discrimination claims because plaintiff only alleged retaliation in her EEOC complaint); see also *Walsh v. National Westminster Bank Corp., 921 F. Supp. 168, 172 (S.D.N.Y. 1995)* (holding that the court lacked jurisdiction over Title VII sexual harassment claim where plaintiff marked box for [*15] retaliation but not sex discrimination); *Williams v. Little Rock Municipal Water Works, 21 F.3d 218 (8th Cir. 1994)* (holding that pro se plaintiff's race discrimination judicial claim was not reasonably related to her second EEOC charge claiming retaliation, even though she alleged that retaliation was due to the filing of her first EEOC charge accusing the same employer of racial discrimination). Ultimately, a charge of discrimination encompasses a higher burden of proof, requiring the complainant to prove that the discriminatory incidents actually occurred. A successful retaliation charge, on the other hand, only mandates that the complainant prove that he or she engaged in a protected activity, and not that the alleged discrimination actually took place.

In the instant action, Gilani's EEOC charge is even less specific than the failed allegations in the Butts' EEOC charge. Gilani stated in his EEOC charge that he "has repeatedly accused management of discriminating against Non-Whites in various ways." This statement merely speaks of his accusations against the NASD on behalf of non-whites, and does not specifically indicate examples of racial discrimination against [*16] himself. Based on the charge here, the EEOC would be expected to focus its efforts primarily on determining whether Gilani's allegations against the NASD sparked illegal retaliatory conduct, the one box Gilani marked off. The Court cannot assume that the EEOC would initiate an investigation of the general and conclusory race discrimination and harassment claims alleged in Gilani's complaint. Because discrimination, retaliation, and harassment represent very different theories of liability, this Court has no jurisdiction over Gilani's Title VII race discrimination and hostile environment claims raised for the first time in his complaint but not in his EEOC charge.

III. Retaliatory Discrimination Claims

A. *Subject-Matter Jurisdiction*

Gilani refers to two denials of promotion as examples of the NASD's retaliatory conduct. On October 1992, Gilani received his annual review. "After being promoted the prior two years," his supervisor denied him a promotion, despite the fact that he "had completed ten more investigations in 1992 than 1991." (Compl. PP 22-23). Approximately two years later, on October 1994, Gilani alleges he received a negative evaluation and was denied a promotion [*17] by a different supervisor from the one who denied him a promotion in October 1992. (Compl. P 22).

Gilani's first denial of promotion claim, which was not included in his EEOC charge, is time-barred by the three year statute of limitations applicable to *§ 1981* claims. *Tadros v. Coleman, 898 F.2d 10, 12* (2d Cir.), cert. denied, *498 U.S. 869, 112 L. Ed. 2d 149, 111 S. Ct. 186 (1990)* (stating that filing an EEOC charge did not toll statute of limitations of a *§ 1981* claim). The October 1992 claim is also time-barred under Title VII because of the statute's requirement that only claims filed 300 days before the filing of an EEOC charge are actionable.

Gilani does not qualify for the continuing violation exception. Typically, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir. 1993)*, cert. denied, *511 U.S. 1052, 128 L. Ed. 2d 339, 114 S. Ct. 1612 (1994)*. However, a continuing violation may be found in the absence of a formal policy, "where specific and related instances of discrimination are permitted by the employer [*18] for so long as to amount to discriminatory policy or practice." *Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994)*. Gilani does not satisfy the high standards set by Lambert and Cornwell.

First, Gilani's initial denial of promotion was not an implementation of an official NASD policy. In fact, Gilani had been promoted previously despite his complaints about the NASD's discriminatory conduct. Second, the fact that Gilani was promoted and received a "large bonus" in between the two promotions he was denied (Compl. PP 35-36), breaks the continuity of the allegedly discriminatory-related practice, and serves to void a continuing violation claim based on retaliation. See *Neilson v. Colgate-Palmolive Co., 1997 U.S. Dist. LEXIS 7697, 1997 WL 297051 (S.D.N.Y. 1997)* ("While

plaintiff alleges that the unlawful denial of promotions and higher compensation were part of an ongoing discriminatory practice and policy by defendants . . . plaintiff has only adduced evidence of separate, discrete, and unrelated instances of failure to promote or to confer raises over a period of fourteen years by different supervisors in different locations and subsidiaries in the company"). Thus, because the [*19] continuing violation exception cannot be invoked under these circumstances, only Gilani's second denial of promotion is before the Court.

In contrast to Gilani's Title VII race discrimination claims, Gilani has properly exhausted his administrative remedies for his October 1994 retaliation claim by filing an EEOC charge specifically alleging retaliatory discrimination. This Court also has jurisdiction to hear this claim under *§ 1981* because *§ 1981* does not require the exhaustion of administrative remedies prior to initiating an action. See *Miller, 755 F.2d 20, 26 (2d Cir. 1985)*, cert. denied, *474 U.S. 851, 88 L. Ed. 2d 122, 106 S. Ct. 148 (1985)*. Because Gilani has satisfied the procedural threshold conferring federal jurisdiction, the Court must now discuss the substance of plaintiff's pleading of the retaliation claim.

B. *Standards for Retaliatory Discrimination*

Gilani asserts that the NASD has "engaged in the discriminatory treatment of Gilani and has retaliated against him, for complaining about its discriminatory practices towards him and towards other minority (by way of race and nationality) employees." (Compl. P 106). Under *42 U.S.C. § 2000e-3(a)* of Title [*20] VII, employers are prohibited from retaliating against employees because they file administrative or other complaints concerning the employer's alleged discriminatory practices. Under *§ 1981*, "all persons shall have the same right to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." *Section 1981(b)*, an amended provision instituted by the Civil Rights Act of 1991, defines the term 'make and enforce contracts' to include "the making, performance, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." The elements that constitute a *prima facie* claim for employment discrimination under *§ 1981* are the same as under Title VII. See *Hudson v. International Business Machines Corp., 620 F.2d 351, 354 (2d Cir. 1980)*, cert. denied, *449 U.S. 1066, 66 L. Ed. 2d 611, 101 S. Ct. 794 (1980)*; *Tomka v. Seiler Corp. 66 F.3d 1295, 1308 (2d Cir. 1995)*, cert. denied, *484 U.S. 965 (1987)*; *Choudhury v. Polytechnic Inst. of New York, 735 F.2d 38, 44 (2d Cir.* [*21] *1985)*. To establish a *prima facie* case for retaliation under Title VII and *§ 1981*, plaintiff must show (a) participation in a protected activity known to the defendant; (b) an employment action disadvantaging the plaintiff, and (c) a causal connection between the protected activity and the adverse employment action. See *De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987)*.

I. Protected Activities

Title VII defines protected activities as (1) an employee's opposition to any activity which is prohibited by Title VII, and (2) as an employee's participation in any Title VII investigation or proceeding. See *Williams v. Boorstin, 213 U.S. App. D.C. 345, 663 F.2d 109, 115 (D.C. Cir. 1980)*, cert. denied, *451 U.S. 985, 68 L. Ed. 2d 842, 101 S. Ct. 2319 (1981)*. In order to prove that a plaintiff engaged in protected activity known by the defendant, he or she need not establish that the conduct he opposed was in fact a violation of Title VII. See *Davis v. State Univ. of N.Y., 802 F.2d 638, 642 (2d Cir. 1986)*. However, the plaintiff must demonstrate a "good faith, reasonable belief that the underlying challenged actions of the employer violated [*22] the law." *Manoharan v. Columbia Univ. College of Physicians and Surgeons, 842 F.2d 590 (2d Cir. 1988)*. Gilani's allegations, stated above, support a credible inference that he possessed a good faith, reasonable belief that his charges of discriminatory practices resulted in his October 1994 denial of promotion. It is also clear from the complaint that Gilani openly expressed his concerns and that the NASD knew of his stated allegations. Cf. *Volberg v. Pataki, 917 F. Supp. 909, 914 (N.D.N.Y. 1996)* (holding that the "good faith belief" standard was applicable to a "typical lay employee," but not to an attorney), aff'd, *112 F.3d 507 (2d Cir. 1996)*. Thus, Gilani succeeds in satisfying the first prong of a *prima facie* case.

2. Adverse Employment Action

To prove that a plaintiff has suffered an adverse employment action in the failure to promote context, the plaintiff must also prove that he or she was qualified for the position for which he or she sought promotion. See *Lambert, 10 F.3d at 57*; *Mendoza v. SSC & B Lintas, 913*

*F. Supp. 295, 301 (S.D.N.Y. 1996)*. Further, a claim under *§ 1981* is actionable "where the promotion rises to the level of an opportunity for [*23] a new and distinct relation between the employee and the employer." *Patterson v. McLean Credit Union, 491 U.S. 164, 185, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989)*. The NASD claims that Gilani has failed "even to identify the positions to which he sought to be promoted, much less that the position was available, that he applied for it, and that he was qualified for it." (Def.'s Mem. In Supp. of Motion to Dismiss at 20.) The NASD, however, has not proffered any statements concerning Gilani's lack of qualifications. In fact, during Gilani's employment with the NASD, he received three promotions and several pay increases. (Compl. PP 22, 35). In Gilani's performance evaluation regarding his October 1994 promotion, the supervisor admitted that Gilani's work product remained the same. (Compl. P 51). Because the Court must draw all inferences in favor of the non-moving party at the pleading stage, *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*, the complaint presents a reasonable inference that Gilani was qualified for the contested promotion.

The fact that Gilani has failed to specify the position to which he was denied promotion is not dispositive. [*24] The Patterson inquiry, which requires that the denied position involve the creation of a new and distinct position with the employer, should not be confined to titles. *Butts, 990 F.2d at 1412*. Determining whether a promotion would result in a new and distinct relationship requires "some factual inquiry into the changes in responsibility and status it will involve." Id. Thus, generally it is inappropriate to dispose of a *§ 1981* claim based on Patterson at the pleading stage." Id.; see also *Lewis v. Digital Equipment Corp., 1993 U.S. Dist. LEXIS 16799, 1993 WL 498047 (S.D.N.Y. 1993)* (refusing to dismiss plaintiff's retaliatory promotion claim for plaintiff's failure to specify the responsibilities of denied position). Because such a determination simply cannot be made by examining the instant complaint, Gilani has adequately plead the second prong of the *prima facie* retaliation test for a Title VII and *§ 1981* retaliatory discrimination claim.

3. Causal Connection

To establish a causal connection, a plaintiff may either show indirectly that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment [*25] of fellow employees who engaged in similar conduct, or directly through evidence or retaliatory animus directed against a plaintiff by defendants. See *Johnson v. Palma, 931 F.2d 203, 207 (2d Cir. 1991)*. Gilani alleges four primary incidents which he believed played a causal role in his October 1994 denial of promotion. First, in or about March 1994, Gilani claimed that after he challenged a study that concluded that there was no disparate treatment in the office between minorities and non-minorities in compensation, Henderson, the head of the investigating committee, screamed at Gilani, and banned him from further meetings. (Compl. P 38). Second, Henderson soon after disbanded the committee. (Compl. P 39). Third, in or about August 1994, Gilani attempted to express his concerns about minority discrimination in an annual meeting with the NASD staff by challenging the results of the compensation study. Before he was able to raise his concerns, the entire staff was dismissed but for a few members. (Compl. P 42). Fourth, in or about September 1994, Gilani challenged the management's decision in its failure to discipline a "rogue broker." (Compl. P 44).

Although the final incident [*26] does not serve to satisfy the third prong for a *prima facie* retaliation claim, the first three incidents, given the relatively close proximity to his October 1994 denied promotion, have raised a "factual question of whether there is a causal nexus between his protected activity and defendant's retaliatory conduct such that it cannot be said that plaintiff cannot prove a set of facts in support of his claim which would entitle him to relief." *Spurlock v. Nynex, 949 F. Supp. 1022, 1032 (W.D.N.Y 1996)*; compare *Zenni v. Hard Rock Cafe Intern., Inc., 903 F. Supp. 644, 656 (S.D.N.Y. 1995)* (holding that nexus requirement was not satisfied because more than a full year had passed between the filing of a charge and the allegation of retaliatory conduct). The issue here is not whether Gilani will ultimately prevail but whether he is entitled to offer evidence to support his claims. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974)*. The burden of establishing a *prima facie* case is not "onerous," and has been frequently described as minimal. *Fisher v. Vassar College, 114 F.3d 1332, 1335 (2d Cir. 1997)*. A plaintiff alleging retaliation can [*27] satisfy the prerequisites for a *prima facie* case and "avoid dismissal . . . *without* submitting evidence sufficient to support a finding in his [or her] favor on each element that the plaintiff must ultimately prove to win." *Id. at*

*1337*. Gilani's cause of action alleging retaliation in his 1994 denial of promotion is therefore sufficient because it satisfies the three requirements set forth to state a viable federal claim of retaliatory discrimination.

VIII. Retaliatory Discharge

A. *Subject-Matter Jurisdiction*

According to Gilani, the NASD's decision to terminate his employment was influenced by a retaliatory motive to punish him for filing an EEOC charge. (Compl. P 106). Although Gilani did not file a retaliatory discharge claim with the EEOC, another type of "reasonably related" claim is one alleging retaliation by an employer for the filing of an EEOC charge. See *Butts, 990 F.2d at 1402*; *Malarkey v. Texaco Inc., 983 F.2d 1204 (2d Cir. 1993)*. The Second Circuit has relaxed the exhaustion requirement based on the close connection of a retaliatory act to both the initial discriminatory conduct and the filing of a timely charge itself. See *Butts,* [*28] *990 F.2d at 1402* (explaining that "requiring a plaintiff to file a second EEOC charge under these circumstances could have the perverse result of promoting employer retaliation in order to impose further costs on plaintiffs and delay the filing of civil actions relating to the underlying acts of discrimination."); *Owens v. New York City Housing Authority, 934 F.2d 405, 410-411 (2d Cir. 1991)*. Therefore, this Court has subject-matter jurisdiction over Gilani's Title VII retaliatory discharge claims. Id. The Court also has jurisdiction over Gilani's *§ 1981* claims because *§ 1981(b)* ensures jurisdiction over the "making, enforcing, and *termination* of contracts." (emphasis added).

B. *Standards for Retaliatory Discharge*

The necessary elements to state a *prima facie* claim for retaliatory discharge are identical to the requirements for retaliatory discrimination. See *Manoharan, 842 F.2d at 593*; *DeCinto v. Westchester County Med. Ctr., 821 F.2d 111, 115* (2d Cir.), cert. denied, *484 U.S. 965, 98 L. Ed. 2d 395, 108 S. Ct. 455 (1987)*. Thus, a plaintiff must show (a) participation in a protected activity known to the defendant; (b) an employment action disadvantaging [*29] the plaintiff, and c) a causal connection between the protected activity and the adverse employment action. See *De Cinto at 115*.

Filing an EEOC charge is a protected activity. See *Yaba v. Cadwalader, 961 F. Supp. 611, 621 (S.D.N.Y. 1997)*. Moreover, similar to Gilani's retaliatory discrimination claims, Gilani's retaliatory discharge claim raises a reasonable inference that Gilani possessed a "good faith, and reasonable" belief that he was terminated for filing an EEOC charge. Gilani therefore satisfies the first prong of the *prima facie* test.

An adverse action affects "the terms, privileges, duration, or conditions of the plaintiff's employment." *Dortz v. New York, 904 F. Supp. 127, 156 (S.D.N.Y. 1995)*. The termination that Gilani allegedly suffered because of the EEOC charge is clearly an adverse employment action, and satisfies the second prong of the *prima facie* test.

The final requirement that Gilani must satisfy in order to state a *prima facie* claim is a causal connection between the EEOC charge and his termination. The string of events set forth by plaintiff demonstrates the existence of a potential causal link: On August 24, 1995, Gilani filed a charge [*30] with the EEOC. On September 13, 1995, Gilani was placed on probation, and the Assistant Director explained that the action was necessary partly because of his "unsubstantiated accusatory remarks made during staff meetings." (Compl. P 65). On September 19, 1995, Gilani was fired, and the NASD claimed that his termination was justified because he improperly used confidential salary information. (Compl. P 71). Proof of a causal connection can be established by showing that the protected activity was closely followed in time by the adverse action. See *Davis v. State University of N.Y., 802 F.2d 538, 642 (2d Cir. 1986)*. Because Gilani was fired only twenty days after filing with the EEOC, the proximity of events raises the inference of a causal link culminating in Gilani's termination, and serves to satisfy the third prong of the *prima facie* test

IV. New York Human Rights Law

Similar to his Title VII claims, Gilani asserts that he has endured racial and retaliatory discrimination and a hostile work environment during his employment with the NASD. *New York Executive Law § 296* outlines the state's humans rights laws, and provides relief for discriminatory violations. The [*31] statute of limitations on a New York Human Rights law claim is three years. [5] Because Gilani filed his complaint on October 28, 1996, he states causes of action for events alleged to have occurred from October 28, 1993.

5 Filing an EEOC charge does not toll a New

York Human Rights claim. See *Katt v. New York City Police Dep't, 1996 U.S. Dist. LEXIS 19400, 1996 WL 744870 (S.D.N.Y. 1996)*.

Under the New York Human Rights law, there is no rule requiring a plaintiff to exhaust administrative remedies. The Second Circuit has indicated that New York courts require the same burden of proof for claims brought under Human Rights laws as those brought under Title VII. See *Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1994)*; *Zveiter v. Brazilian Nat'l Superintendency, 833 F. Supp. 1089 (S.D.N.Y. 1993)*; *Espaillat v. Breli Originals, Inc., 227 A.D.2d 266, 642 N.Y.S.2d 875* (N.Y. App. Div., 1st Dep't 1996).

A. *Retaliation*

Under *New York Executive Law § 296 (1)(e)*, an employer is forbidden to "discharge, expel or otherwise discriminate [*32] against any person because he has opposed any practices forbidden under this article, or because he has filed a complaint, testified in any proceeding under this article." Because the Court has recognized Gilani's federal retaliation and retaliatory discharge claims, the Court also asserts jurisdiction over Gilani's corresponding state retaliation claims. [6]

6 Although New York courts recognize the continuing violation doctrine, see *Sunshine v. Long Island Univ., 862 F. Supp. 26, 30 (E.D.N.Y. 1994)*, Gilani's first denial of promotion is time-barred under New York's Human Rights law's statute of limitations. See *Neilson v. United Parcel Service Inc., 210 A.D.2d 641, 642, 619 N.Y.S.2d 844, 845* (N.Y. App. Div., 3rd Dep't 1994) (holding that absent "compelling circumstances," individual instances of failure to promote do not constitute a continuing violation under *§ 296* even though plaintiff claimed that he was wrongfully passed over for promotion several times within the limitations period).

B. *Race* [*33] *Discrimination*

Gilani further alleges that he was subjected to racially discriminatory practices during the course of his employment with the NASD. Gilani maintains that the NASD discriminated against him in promotion, compensation, and in its decision not to follow his recommendations regarding the regulation of brokers. In support of his contention that there was inequality in compensation, Gilani alleges that on September 13, 1995, he received a confidential document which disclosed that "*non-minority* NASD examiners with the same experience and seniority as he had were earning from 4% to 70% more than he was." (Compl. P 69). *New York Executive Law § 296 (1)(a)* forbids an employer from "discriminating against an individual in compensation or in terms, conditions or privileges of employment." If the racial disparity in compensation is proven to be true, Gilani will clearly have a basis for relief under the state's human rights laws. Similarly, the issue whether the NASD was driven by racially discriminatory motives as well as retaliatory motives in its decision to deny Gilani a promotion in 1994 and to discharge him in 1995 is a question of fact for the jury, and cannot be [*34] dismissed. The Court therefore maintains jurisdiction over Gilani's race discrimination claims concerning compensation and promotion under the New York Human Rights laws. The Court, however, dismisses Gilani's discrimination claims relating to the NASD's rejection of his regulatory suggestions in PP 44-64 in his complaint because they do not directly impact the terms and conditions of his employment.

C. *Hostile Work Environment*

1. Continuing Violation Doctrine

In or about January 1992, approximately three years into his employment with the NASD, Gilani claims that he began to endure a racially hostile work environment that lasted until the day he was fired. (Compl. P 15). Gilani alleges the following pre-October 1993 incidents in order to state a claim for a hostile work environment under *§ 296 (1)(a)*: In or about, January 1992, Devereaux, a white male who was Gilani's supervisor wrote a note to the examiner stating that Robertson, an African-American employee, was a "scumbag." (Compl. P 16). In or about March 1992, most of Gilani's major investigations were removed from his control by Devereaux and given to Farmer, a white female. (Compl. P 17). In or about 1992, at an annual [*35] meeting with John Pinto, the Executive Vice President of the NASD, Gilani asked about the lack of minority representation. (Compl. P 18). The following day Devereaux and the Assistant Director told Gilani that he had embarrassed them and that he should never address the issue of racial discrimination with Pinto. Thereafter, Devereaux stated to Gilani in a threatening manner, "I'm going to make your life difficult." (Compl. PP 19-21). In October 1992,

Gilani received his annual review, and was denied a promotion. Shortly thereafter, Gilani was denied a bonus, and upon reconsideration he received a bonus, but claimed that the bonus was much lower than paid to other examiners with whom he worked. (Compl. PP 22-28).

Gilani alleges the following post-October 1993 conduct: In March 1994, the study requested by Gilani was completed concluding that there was no racial disparity in compensation. Gilani challenged the results, and Henderson, the head of the committee "screamed" at him, ordered him out of the meeting, and banned Gilani from attending further meetings. Shortly thereafter, Henderson disbanded the committee. (Compl. P 39). In August 1994, Gilani again challenged the results of [*36] the study at Pinto's annual meeting, and was promised that the charges would be investigated, but they never were. (Compl. PP 42-43). On September 13, 1995 Gilani was placed on probation, and on September 19, 1995, Gilani was fired.

Gilani, however, has failed to plead adequately the continuing violation doctrine that would allow the Court to recognize claims prior to October 28, 1993. In order to plead a continuing violation claim, the plaintiff must include a series or pattern of ongoing events which continue into the filing period. See *Alveari v. American Int'l Group, Inc., 590 F. Supp. 228, 231 (S.D.N.Y. 1984)* (citations omitted); *Neilson, 210 A.D.2d at 642, 619 N.Y.S.2d at 845*. The fact that Gilani did not allege an identifiable act of harassment from October 1992 to March 1994 itself demonstrates that an ongoing discriminatory policy or practice was not in place. See *Ahmed v. Samson Management Corp., 1996 U.S. Dist. LEXIS 4924, 1996 WL 183011 (S.D.N.Y. 1996)* (holding that absent an official policy or mechanism, a continuing violation may not be found where discrimination is limited to isolated incidents but must create a continuing series of pattern of events); [*37] see also *Sunshine v. Long Island Univ., 862 F. Supp. 26, 30 (E.D.N.Y. 1994)* ("It is insufficient to characterize acts as continuous violations for the sole purpose of prolonging the life of a discrimination claim). [7] Notwithstanding this conclusion, actions prior to October 28, 1993 may constitute relevant and probative background evidence, and will aid the Court in its consideration of the motion to dismiss. See *Malarkey v. Texaco, Inc., 559 F. Supp. 117, 121 (S.D.N.Y. 1982)*, aff'd *704 F.2d 674 (2d Cir. 1983)*. Although the allegations concern time-barred conduct, "it is relevant, . . . and may be used . . . to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives." Id. (quoting *Downey v. Southern Natural Gas Co., 649 F.2d 302, 305 (5th Cir. 1981))*.

7 Although the Court has not found a continuing violation, the Court grants Gilani leave to replead a continuing hostile environment claim if he has grounds to assert a continuing violation.

2. Standards [*38] for Hostile Environment Claim

In order to successfully plead a hostile work environment claim, the plaintiff must be subjected to harassment that "permeated [the workplace] with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and to create an abusive working environment." *Harris v. Forklift Sys., Inc, 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993)* (quoting *Meritor Sav. Bank v. Vinson, 477 U.S. 57, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986))*; see also *Matter of Father Belle Community, 221 A.D.2d 44, 49, 642 N.Y.S.2d 739, 744 (1996)* (same). "Whether a workplace should be viewed as hostile or abusive from both a reasonable person's standpoint as well as the victim's subjective perception can only be determined by considering the totality of the circumstances." *Tomka v. Seiler Corp., 66 F.3d 1295, 1304 (2d Cir. 1995)*.

In construing the totality of events most favorable to the plaintiff, the facts presented by Gilani are sufficient to survive a motion to dismiss. Although there is some question as to whether Gilani will be able to establish by a preponderance of the [*39] evidence that NASD engaged in pervasive racially hostile conduct, this issue should not be resolved at the pleading stage. See *Dortz v. City of New York, 904 F. Supp. 127, 151 (S.D.N.Y. 1995)*. Because a single incident could be deemed sufficient to create a hostile work environment, see *Tomka, at 1305*; *Carrero v. New York City Housing Authority, 890 F.2d 569, 578 (2d Cir. 1989)*, a reasonable jury could possibly find that the incidents alleged by Gilani seriously affected the terms and conditions of his employment. The Court subsequently maintains jurisdiction over Gilani's hostile work environment claims under New York Human Rights law *§ 296*.

IV. Breach of Contract Claim

Gilani premises his breach of contract claim upon the fact that the NASD allegedly discharged him for

following the ethical rules and standards set forth in the NASD Employment Handbook. Gilani maintains that the NASD required him to sign a statement on "employee guidelines" indicating that he had received and agreed to comply with the terms of the Handbook. Gilani contends that implicit in this employment agreement was a promise by the NASD not to terminate him for complying with the Handbook [*40] and Guidelines. (Compl. P 86).

In order to establish a contractual limit on an at-will relationship, a plaintiff must prove that (1) the employer had an express written policy limiting its right of discharge; (2) the employer made the employee aware of that policy; and (3) the employee detrimentally relied on that policy in accepting the employment. *De Petris v. Union Settlement Ass'n, Inc., 86 N.Y.2d 406, 633 N.Y.S.2d 274, 276, 657 N.E.2d 269 (Ct. App. N.Y. 1995).* Here, however, by plaintiff's own admission, no "express" agreement existed but only an implicit understanding. Moreover, paragraphs eighty- six to ninety- one of the Handbook explicitly contradict plaintiff's implied understanding. In bold type, the Handbook states that: "Employment with the NASD is employment at-will and such may be terminated by the NASD or by the employee at any time for any reason. No contract exists or is implied by the agreement." Thus, no express written limitation exists on NASD's power of at-will termination by contract. See *Wright v. Cayan, 817 F.2d 999, 1002 (2d Cir. 1987)* (holding that the law is well settled in New York that employment is at will and can be terminated at any time by [*41] either party, unless the duration of an employment contract is explicitly set forth); *Leahy v. Federal Express Corp., 609 F. Supp. 668, 672 (E.D.N.Y. 1985)* (holding that claims for breach of contract remain legally insufficient because nowhere in the record is there any indication of an express limitation of Federal Expresss's right to terminate employees at will).

Gilani's reliance on *Weiner v. McGraw-Hill, Inc., 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982)* is misplaced. In Weiner, the N.Y. Court of Appeals held that a plaintiff had plead a cause of action for breach of contract even though he had not been hired for a specific term of employment because the employee's handbook suggested that en employee would be dismissed only for "just and sufficient cause." The NASD Handbook here, however, contains no similar provision. The instant action is more similar to *Patrowich v. Chemical Bank, 98 A.D.2d 318, 470 N.Y.S.2d 599* (1st Dep't), *appeal dismissed, 62 N.Y.2d 801, aff'd per curium, 63 N.Y.2d 541, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984)*, in which the court held that a plaintiff's reliance upon an employee manual was insufficient because Chemical's manual [*42] "contained no provision requiring terminations solely for good cause shown," but merely provided "general policy statements and supervisory guidelines." Unlike the handbook in Weiner, but more like the handbook in Patrowich, the NASD's Handbook explicitly reaffirmed the employer's right to terminate employees at will, and thus cannot support a breach of contract claim.

Gilani also contends that employers cannot terminate employees if motivated by a constitutionally impermissible purpose. According to Gilani, this proscription provides a basis for a breach of contract claim against an employer who discriminates or retaliates against a plaintiff. See *Murphy v. American Home Products Corp. 58 N.Y.2d 293, 305, 461 N.Y.S.2d 232, 237, 448 N.E.2d 86 (N.Y. Ct. App. 1983)* (stating that in an at-will relationship the law accords the employer an unfettered right, absent a constitutionally impermissible purpose and a statutory proscription). In *Fry v. McCall, 945 F. Supp. 655, 667 (S.D.N.Y. 1996)*, however, the Court explained that,

> Employers do not have the right to fire their employees in violation of statutory or constitutional mandates. However, such violations give [*43] rise to claims under those laws or constitutional protections themselves, they do not create a separate cause of action for breach of contract under New York law. Were it otherwise, any firing in violation of a statute or constitutional mandate would also give rise to a breach of contract claim.

See also *O'Keefe v. Niagara Mohawk Power Corp., 714 F. Supp. 622, 633* (N.D.N.Y.) (1989) ("it is a 'theoretical fallacy' to assume that every employee asserting a discrimination claim would automatically have a breach of contract claim. That absurd result was obviously not the intent of the New York courts"). This Court concurs that Title VII and *§ 1981* do not independently give rise to a breach of contract claim.

V. Intentional Infliction of Emotional Distress

A. *Statute of Limitations*

Gilani asserts that the NASD has caused him to suffer severe emotional distress (Compl. P 100), and that it "culminated" in a medical condition in August 1994 that was first believed to be a heart attack. (Compl. P 78). The statute of limitations for the tort of intentional infliction of emotional distress ("IIED") is one year. *C.P.L.R. § 215(3)*. The Court, therefore, does not have [*44] jurisdiction over Gilani's IIED claim because he filed this action on October 28, 1996, which is more than one year after he was fired by the NASD on September 19, 1994, and over one year after the medical condition allegedly "culminated."

B. *Continuing Tort Doctrine*

Gilani asserts that the IIED tort claim is not barred by the one-year statute of limitations because he pleads allegations of a continuing course of conduct that occurred within one year of filing the action. See *Summers v. County of Monroe, 147 A.D.2d 949, 537 N.Y.S.2d 703* (N.Y. App. Div., 4th Dep't 1989). After his termination, Gilani alleges that the NASD purposely planned to prevent him from ever working in the securities business by "orally distributing information from his adverse performance evaluations which it knows to be false and slanderous." (Compl. P 83). "To date, Gilani has been on more than 100 interviews and has only received one offer of employment." (Compl. P 82). Gilani also maintains that the NASD was responsible for the FBI questioning him on February 1996 about letters threatening to bomb the NASD (Compl. P 84). Gilani claims that he was told by the FBI that it would interview all former [*45] NASD employees in conjunction with its on-going investigation. (Comp. P 84). "Upon information and belief," however, Gilani argues that "no other former NASD employees were interviewed." Id.

In order to qualify for the continuing violation exception to the statute of limitations, Gilani must show that the post-termination conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency to be regarded as atrocious, and utterly intolerable in a civilized society." *Fischer v. Maloney, 43 N.Y.2d 553, 558, 402 N.Y.S.2d 991, 992-93, 373 N.E.2d 1215 (N.Y. Ct. App. 1978)* (quoting *Restatement (2d) Torts § 46(1)*). The continuing conduct must be in and of itself actionable and not merely the effect of prior tortious conduct. See *Bonner v. Guccione, 916 F. Supp. 271, 275-78 (S.D.N.Y. 1996)*; see also *Collins v. Willcox Inc., 158 Misc. 2d 54, 600 N.Y.S.2d 884, 886 (Sup. Ct. 1992)* ("the continuous nature of the conduct may make it sufficiently outrageous that a jury could reasonably find in [plaintiff's] favor on the emotional distress allegation").

Gilani's claims are insufficient to support a continuing tort doctrine because the [*46] alleged conduct that falls within the limitations period does not satisfy the "extreme and outrageous" requirement. Even if accepted as true, the FBI questioning and the preclusion of prospective employment, regardless of its possible impropriety, do not constitute conduct "that goes beyond all possible bounds of human decency." *Fischer, 43 N.Y.2d at 557, 402 N.Y.S.2d at 993*. Allegations advanced in other cases have been more serious than those claimed by Gilani. Nevertheless, the overwhelming majority of these claims have failed to satisfy the exceedingly high threshold deliberately instituted by the New York Courts. See *Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (Ct. App. N.Y. 1993)* ("Almost everyone has failed because the alleged conduct was not sufficiently outrageous"). See e.g., *Spence v. Maryland, 995 F.2d 1147, 1158 (2d Cir. 1993)* (affirming dismissal of IIED claim despite allegations that supervisors engaged in a two year campaign of intimidation and harassment intentionally calculated to cause plaintiff to leave his employment prematurely and involuntarily, and which resulted in severe stress related problems); *Jones* [*47] *v. Trump, 919 F. Supp. 583, 1997 U.S. Dist. LEXIS 10113, 1997 WL 394950*, at *3 (S.D.N.Y. 1997) (holding that plaintiff's IIED claim was too vague and conclusory, and did not rise to the level required by New York courts even though plaintiff claimed false criminal charges, false arrest, false investigation and false imprisonment); Tarr, 958 F. Supp. at 805 (dismissing IIED claim that defendants wrong is continuing because defendants were still seeking to make plaintiff a scapegoat and to destroy plaintiff's career by disparaging him and holding him up to scorn and ridicule in the financial community); *Murphy v. American Home Products Corp., 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (N.Y. Ct. App. 1983)* (dismissing IIED claim for failure to state *prima facie* case despite allegations that plaintiff was transferred, demoted, and ultimately discharged for reporting fraud; and that he was forcibly escorted from the building by guards when he returned to pick up his belongings). The rare instances where the New York courts have found the complaint sufficient to state an IIED claim in the employment context generally

involve allegations of more significant battery, or improper physical [*48] contact. See *Olszewski v. Bloomberg, 1997 U.S. Dist. LEXIS 9654, 1997 WL 375690*, at *7 (S.D.N.Y. 1997) (permitting IIED claim because plaintiff alleged that she was raped and pressured not to reveal that fact after defendant became her supervisor); *O'Reilly v. Executone of Albany, Inc., 121 A.D.2d 772, 503 N.Y.S.2d 185* (N.Y. App. Div. 3rd Dep't 1986) (holding that plaintiff argued a viable IIED claim because she alleged that she was "intentionally, repeatedly, and maliciously touched her in a sexual manner"). [8]

8 The FBI-related allegations, which implicate the NASD's involvement, are also inadequate to constitute a continuing course of conduct that was extreme and outrageous because it was the FBI, and not the NASD that conducted the investigation. Moreover, the questioning did not result in an arrest.

In addition to failing to satisfy the "extreme and outrageous test," Gilani's assertions rest on tenuous factual grounds. Gilani's allegation that the NASD precluded employment opportunities is ineffectual [*49] because he has withdrawn his tortious interference with existing business relations and libel per se claims because of his difficulty in identifying specific third-parties. Gilani's FBI-related allegations are also too vague and conclusory to survive a motion to dismiss because he does not offer any specific facts to support his "belief" that he was the only one questioned by the FBI. A vague allegation containing no concrete facts of continuing course of conduct can not survive. See *Wolff v. City of N.Y. Financial Services, 939 F. Supp. 258 (S.D.N.Y. 1996)*; see also *Martin v. N.Y. State Dep't of Mental Hygiene, 588 F.2d 371, 372 (2d Cir. 1978)* (holding that a complaint consisting of nothing more than naked assertions, and setting forth no fact upon which a court could find a violation, fails to state a claim under 12(b)(6)).

Gilani's post-termination allegations fail to satisfy the continuing tort doctrine based on "extraordinarily" high standard of outrageous and atrocious, and thus Gilani cannot escape the restrictions set by the one year statute of limitations. See *Tarr v. Credit Suisse Management, Inc., 958 F. Supp. 785 (S.D.N.Y. 1997)* (New York courts have been reluctant [*50] to expand the general theory of continuing wrongs based on the intentional infliction of emotional distress); *Spitzer v. Shanley Corp., 151 F.R.D. 264, 267 (S.D.N.Y. 1993)* (same).

VI. *Prima Facie* Tort

Gilani believes he is entitled to relief under the theory of *prima facie* tort because of the NASD's "wrongful, malicious, and willful actions," that it has "intentionally inflicted upon Plaintiff." (Compl. PP 103-04). In order to recover for *prima facie* tort in New York, the plaintiff must prove (1) the intentional infliction of harm, (2) resulting in special damages, (3) without any excuse or justification, and (4) by an act or series of acts which would otherwise be lawful. *Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741, 480 N.E.2d 349 (N.Y. Ct. App. 1985)*. In addition, the complaint must allege that defendant was motivated *solely* by a malicious intention to injure plaintiffs. *Rodgers v. Grow-Kiewit Corp., 535 F. Supp. 814, 816* (S.D.N.Y.), aff'd, *714 F.2d 116 (2d Cir. 1992)*.

A critical element of a *prima facie* tort is that the plaintiff suffered specific and measurable loss, which requires an allegation of special damages. [*51] See Freihoffer, 65 N.Y.2d at 144, 490 N.Y.S.2d at 735. Gilani claims that defendant has intentionally inflicted severe harm upon him, without excuse or justification, and as a result, he has sustained damages in a sum in excess of "TEN MILLION DOLLARS" with interest, and seeks punitive damages or relief in the sum in excess of "TEN MILLION DOLLARS." This general damage claim, which is the same amount that Gilani requests for each of his other causes of action, is not stated with enough particularity to constitute an adequate pleading of special damages as required under New York law. See *Azby Brokerage, Inc. v. Allstate Ins. Co., 681 F. Supp. 1084, 1088 (S.D.N.Y. 1988)* (holding that plaintiffs do not assert special damages by stating that lost commissions amount to "at least ten million dollars"); *Crimpers Promotions, Inc. v. Home Box Office, Inc., 554 F. Supp. 838, 849-50 (S.D.N.Y. 1982)* (holding that general damage that are not more specifically itemized are insufficient to satisfy requirement for *prima facie* tort), aff'd *724 F.2d 290 (2d Cir. 1983)*. Thus, Gilani has failed to satisfy an essential prerequisite necessary to properly plead a *prima facie* tort [*52] claim.

A "*prima facie* tort should not become a 'catch all' alternative for every cause of action which cannot stand on its own legs." *Belsky v. Lowenthal, 62 A.D.2d 319,*

*323, 405 N.Y.S.2d 62* (N.Y. App. Div. 1st Dep't 1978), aff'd, *47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (Ct. App. 1979)*. Where relief may be afforded under traditional tort concepts, *prima facie* tort may not be invoked as a basis to sustain a pleading which otherwise fails to state a cause of action in conventional tort. *Freihofer, 65 N.Y.2d at 144, 490 N.Y.S.2d at 745 (1985)*. Because Gilani could have obtained complete relief under his IIED claim but failed to state a cause of action and failed to comply with the statute of limitations, [9] Gilani may not plead a claim under *prima facie* tort. See *Jones v. City of N.Y., 161 A.D.2d 518, 555 N.Y.S.2d 788, 789* (N.Y. App. Div. 1st Dep't 1990) (holding that because complete relief was available under traditional tort theories, dismissal of traditional tort claims required dismissal of *prima facie* tort claim as well). See also *Kelber v. Forest Electric Co., 799 F. Supp. 326 (S.D.N.Y. 1992)* (dismissing *prima facie* tort claim after [*53] dismissing IIED claim on statute of limitations grounds because a plaintiff cannot use a *prima facie* tort claim, which has a three-year statute of limitations period to avoid the shorter statute of limitations applicable to other intentional torts.); *Belsky, 405 N.Y.S.2d at 65* (holding that plaintiffs may not "avoid stringent requirements we have set for traditional torts, by pleading prima facie tort" in the alternative).

9 Gilani similarly requested $ 10,000,000 for relief under his *prima facie* tort claim.

IX. Leave to Amend

In Gilani's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, he requests leave to replead if necessary. *Fed. R. Civ. P. 15(a)* requires that leave to amend "shall be freely given when justice so requires." Accordingly, a court should grant a motion to amend absent "undue delay, bad faith, futility, and perhaps most important, the resulting prejudice to the opposing party." *State Teachers Retirement Bd. v. Fluor Corp., 654 F.2d 843, 856 (2d Cir.* [*54] *1981)*. When analyzing a motion for leave to amend, the court must determine whether any facts exist under which a particular cause of action could be sustained. See *Picotte v. Community Child Care Ctr., 901 F. Supp. 588, 595 (W.D.N.Y. 1995)*. Under this standard, the Court does not grant leave to amend Gilani's breach of contract claim because no additional facts can circumvent the fact that the NASD did not limit its at-will relationship privilege. Moreover, Gilani has not identified any reason to afford leave to amend either his IIED claim, which is barred by the statute of limitations, or his *prima facie* tort claim, which is ultimately a recasting of his failed IIED claim. Gilani is also not granted leave to amend his Title VII race discrimination and hostile environment claims because they were dismissed for lack of subject-matter jurisdiction. The Court, however, grants leave to amend the claim for a continually-pervasive hostile work environment within the twenty day period allotted by *Rule 15(a)* on the assumption that Gilani will replead only if he has grounds to assert sufficiently a continuing pattern of discriminatory harassment.

**CONCLUSION**

For the reasons [*55] discussed above, the NASD's motion to dismiss is **DENIED** in part, and **GRANTED** in part in accordance with this Opinion. The parties are hereby ordered to appear at a conference on Friday, August 29, 1997 at 3:30 P.M. The parties are directed to bring a case management plan for discussion.

**SO ORDERED.**

Dated: New York

August 18, 1997

**SONIA SOTOMAYOR**

**U.S.D.J.**