*450 F. Supp. 2d 275, \*; 2006 U.S. Dist. LEXIS 64886, \*\**

JOAN **OCHEI**, Plaintiff, - against - COLER/**GOLDWATER MEMORIAL HOSPITAL**; NYC HEALTH & HOSPITALS CORP., Defendants.

00 Civ. 4702 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

450 F. Supp. 2d 275; 2006 U.S. Dist. LEXIS 64886

August 31, 2006, Decided
September 12, 2006, Filed

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff former employee sued defendant former employers, alleging constructive discharge, hostile work environment, and retaliation due to race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., and a city code. The employers moved for summary judgment dismissing the suit. The employee contested the motion.

**OVERVIEW:** The employee worked for a probationary period as a licensed practical nurse. Although most of the others in a required class were black, she was the only Nigerian. The employers provided standard evaluations and observations. The employee received a warning and counseling for violations of certain hospital policies. Based on performance evaluations, a supervisor decided to limit the employee's duties and provide her with additional training for administering medication. The employee responded by resigning. Her request for reinstatement was denied due to her performance evaluations. The employee noted five derogatory comments regarding her national origin from coworkers, but none from supervisors. The court granted the employers' motion. The employee failed to show that she was qualified for her job or any evidence giving rise to an inference of discriminatory treatment. The few national origin statements were insufficient to show a hostile work environment. No reasonable juror would conclude that the offer of additional training constituted intolerable work conditions supporting a constructive discharge claim, and the employee failed to show any elements for a retaliation claim.

**OUTCOME:** The court granted summary judgment in favor of the employers and dismissed the employee's complaint.

**CORE TERMS:** medication, patient, nurse, training, national origin, work environment, discriminatory, supervisor, hostile, summary judgment, prima facie case, protected activity, nursing, narcotic, administering, material fact, resign, pain, matter of law, human rights, citations omitted, discriminatory conduct, retaliation, quotation, controlled substances, genuine issue, reasonable person, constructive discharge, causal connection, constructively

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Summary Judgment > Standards > Legal Entitlement

**HN1** Pursuant to Fed. R. Civ. P. 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A court will not try issues of fact on a motion for summary judgment, but rather, will determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

Civil Procedure > Summary Judgment > Standards > Appropriateness

**HN2** Summary judgment is appropriate where the moving party has shown that little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper. If, however, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.

Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants
Civil Procedure > Summary Judgment > Evidence

**HN3** A moving party on summary judgment has the burden of showing that there are no material facts in dispute, and a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion.

Civil Procedure > Summary Judgment > Evidence
Civil Procedure > Summary Judgment > Standards > Legal Entitlement

**HN4** Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the nonmovant, a court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.

Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality

**HN5** A material fact for summary judgment is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Labor & Employment Law > Discrimination > General Overview
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

**HN6** In Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C.S. § 2000e et seq., employment discrimination cases, a plaintiff has the initial burden to establish a prima facie case by pointing to evidence in the record demonstrating that she: (1) is a member of a protected class; (2) was performing her job satisfactorily; (3) suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of discrimination. The United States Court of Appeals for the Second Circuit has noted that claims brought under the New York State's Human Rights Law, N.Y. Exec. Law § 290 et seq., are analytically identical to claims brought under Title VII. The Second Circuit and New York state courts traditionally have applied the same standards of liability for claims under the New York City Human Rights Law, New York City, N.Y., Admin. Code § 8-101 et seq.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting
Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burdens of Proof

*HN7* If a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., plaintiff meets the burden of establishing a prima facie case, then the burden of production (although not the burden of proof) shifts to the employer to show that any adverse employment actions were taken for legitimate, nondiscriminatory reasons. Once defendants produce such evidence, the presumption raised by the prima facie case simply drops out of the picture. At that point, the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Circumstantial & Direct Evidence

*HN8* To raise an inference of discriminatory intent in a Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., case, the comments and behaviors a plaintiff has objected to must be linked in some way to plaintiff's protected status. This linkage is typically found in the use of invidious or ethnically degrading comments.

Labor & Employment Law > Discrimination > Disparate Treatment > Proof > Burden Shifting

*HN9* Whether job performance is satisfactory depends on the employer's criteria for the performance of the job--not the standards that may seem reasonable to a jury or judge. In determining whether an employee is qualified under the second prong of the McDonnell Douglas analysis, a court must examine the criteria the employer has specified for the position.

Labor & Employment Law > Discrimination > National Origin Discrimination > Proof > Employee Burdens

*HN10* A mere possibility, standing alone, is insufficient to support an inference of discrimination based on national origin.

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment

*HN11* To establish a claim for hostile work environment under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq., and the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq., a plaintiff must demonstrate discriminatory conduct that was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. A plaintiff must set forth facts that support both a subjective and an objective belief that her work environment was hostile for discriminatory reasons. Even if a plaintiff could show a subjective belief that her work environment was hostile, she must establish prima facie evidence that a reasonable person would have concluded that the work environment was hostile. To make this showing, a plaintiff must point to evidence in the record indicating that her workplace was permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. The United States Court of Appeals for the Second Circuit requires a showing of a continuous and repeated pattern of explicit discriminatory slurs or a few particularly severe incidents of discrimination.

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment

Get a Document - by Party Name - ocher AND goldwater memorial hospital
Case 1:07-cv-08722-RJS   Document 19-5   Filed 11/06/2007   Page 4 of 14
Page 4 of 15

*HN12* For discriminatory comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious discriminatory comments. Isolated remarks or occasional episodes of harassment will not merit relief under Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000e et seq.

Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Employer Liability > Coworkers
Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment

*HN13* An employer is liable under the New York City Human Rights Law for the conduct of nonsupervisory employees creating a hostile work environment only where the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action, New York City, N.Y. Admin. Code § 8-107(13)(b)(2), or should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct, New York City, N.Y. Admin. Code § 8-107(13)(b)(3).

Labor & Employment Law > Wrongful Termination > Constructive Discharge > Burdens of Proof
Labor & Employment Law > Wrongful Termination > Constructive Discharge > Statutory Application > Title VII of the Civil Rights Act of 1964

*HN14* A plaintiff's claim for constructive discharge requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions so intolerable that a reasonable person in the employee's position would have felt compelled to resign. Upon that showing, the employee's decision to resign "is assimilated to a formal discharge for remedial purposes. A claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview

*HN15* In order to make out a prima facie case of retaliation, a plaintiff must prove that: (1) she engaged in protected activity; (2) defendants were aware of the protected activity; (3) she was subjected to an adverse employment action; and (4) there is a causal connection between the protected activity and the adverse employment action.

Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link

*HN16* A retaliation plaintiff cannot simply allege a causal connection; rather, she must point to admissible facts upon which a jury could find a causal connection between a protected activity and an adverse employment action.

**COUNSEL:** [**1] LLOYD SOMER, ESQ., Attorney for Plaintiff, New York, NY.

HONORABLE MICHAEL A. CARDOZO, Corporation Counsel of the City of New York, Attorney for Defendants, New York, NY, By: SHIVANI SONI, Assistant Corporation Counsel, Of Counsel.

**JUDGES:** ROBERT W. SWEET, U.S.D.J.

**OPINION BY:** ROBERT W. SWEET

**OPINION**

[*277] Sweet, D.J.,

Defendants Coler/Goldwater Memorial Hospital ("Coler/Goldwater") and the New York City Health and Hospitals Corporation ("HHC") (collectively, "Defendants"), have moved pursuant to Rule 56, Fed. R. Civ. P., to dismiss the complaint of the plaintiff Joan Ochei ("Ochei") alleging discrimination on the basis of race and national origin. For the reasons set forth below, the Defendants' motion is granted and the complaint is dismissed.

*Prior Proceedings*

Ochei filed her complaint *pro se* on June 26, 2000, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "SHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* [**2] (the "CHRL"), namely, that she was constructively discharged on the basis of her race (black), and national origin (Nigerian), [*278] subjected to a hostile work environment, and retaliated against for complaining about her treatment. Ochei has alleged that the Defendants discriminated against her and violated her rights by: not granting her an immediate position as a Licensed Practical Nurse ("LPN"), noting her failure to follow policies regarding the administration of narcotics, improperly transferring her, giving her negative evaluations, failing to adequately train her, limiting her duties and sending her to staff education, constructively discharging her, denying her an exit interview, and refusing to reinstate her.

An amended complaint was filed on April 20, 2001, discovery proceeded and the instant motion was heard and marked fully submitted on March 29, 2006.

*The Facts*

The facts are derived from the Local Civil Rule 56.1 Statements of the parties and are not in material dispute except as noted below.

Ochei began working for HHC in 1991 as a Home Health Aide and became a Nurses' Aide in 1995 while she was at Coler/Goldwater. On or about August 8, 1997, she was accepted [**3] by the New York City Board of Education's Office of Adult and Continuing Education for training as an LPN and attended classes for one year to qualify for this title. She took a ten-month paid leave of absence from Coler/Goldwater to complete courses to become an LPN.

On September 23, 1998, Ochei received her qualifying license as an LPN from the State University of New York's Education Department. She was promoted from a Nurses' Aide to an LPN at Coler/Goldwater effective October 5, 1998, and received the title and salary of an LPN. According to Ochei, her salary as an LPN was $200-$300 a week more than her prior salary.

Ochei's probationary period as an LPN was scheduled to end on April 5, 1999.

From October 5, 1998 until orientation began on or about October 24, 1998, Ochei performed the duties of a Nurses' Aide although she was licensed as an LPN and had the LPN title. All other recently licensed LPNs at Coler/Goldwater did not begin performing LPN duties until they attended orientation at Coler/Goldwater in October 1998.

Get a Document - by Party Name - ochei AND goldwater memorial hospital
Case 1:07-cv-06172-NRB    Document 19-5    Filed 11/06/2007    Page 6 of 14
Page 6 of 15

Ochei attended a classroom orientation and training as an LPN from October 24, 1998 until November 17, 1998. All new LPNs must attend classroom orientation. [**4] According to Ochei, most of her classmates and most nurses at Coler/Goldwater were black.

Ochei has testified that she was the only Nigerian in her class. The Personnel Services Management System of the HHC does not indicate otherwise.

During training, Ochei received a review of the job duties of an LPN, including: providing nursing care to patients, administering records, medications, and treatments to patients; preparing for and assisting physicians with diagnostic procedures; reinforcing, supporting, and providing health care instructions to patients; and observing and reporting patients' vital signs, symptoms, and general conditions.

During training, the relevant HHC policies and procedures regarding LPN duties were also reviewed with Ochei. Department of Nursing Patient Care Policy No. 46 ("Policy No. 46") sets forth details regarding general administration of medication. In administering medication, all nurses must check the medication administration record ("MAR/Medex") with the physician's order, identify the patient/resident by calling his/her name and reading his/her wristband, wash hands before and after each administration, read labels [*279] three times (when removing from [**5] drawer, before pouring, and after pouring), give the patient/resident the medication and remain with him/her to ensure that medication is swallowed, and observe the patient/resident for medication side effects and inform a physician if any occur. In addition, nurses must be able to classify drugs and identify generic names of medication. Procedures for administering controlled substances require that two nurses physically count controlled substances at the change of shift and sign the narcotic sheet, and that all controlled substances administered must be documented immediately in the unit records with the date and hour of administration, name and age of patient, and the name of the prescribing physician. Policy No. 46 states that "pre-signing of the sheet(s) prior to the count is prohibited and will be subject to progressive disciplining." Policy No. 46 has not been substantially changed since 1998.

Upon completing classroom training, Ochei was supervised and paired with a "buddy" in the A-11 Nursing Facility unit while she continued training. This was not a permanent assignment but rather the unit where Ochei was to continue her training and education as an LPN. After classroom [**6] training, the class was spread out among a variety of different departments to continue training. None of Ochei's classmates were assigned to her unit and she did not see them daily. On November 13, 1998, Ochei was paired with a medications nurse to prepare, administer, record, and transcribe orders.

Ochei was scheduled to be observed on November 14, 1998, but was not. According to the Defendants, if someone was not observed as scheduled, this would be due to scheduling difficulties between the observer and the observed. According to Ochei, improper action was taken with respect to scheduling as a result of national origin discrimination.

According to the Defendants, on or about November 26, 1998, Ochei erroneously documented that she had administered narcotics to a patient in the A-11 unit. Ochei has disputed that the documentation was erroneous.

On November 29, 1998, a Ms. Newman ("Newman") explained that Ochei's entry in the log book had to have been a mistake because the count of narcotics was the same before and after Ochei's log entry on the narcotic sheet. Accordingly, Newman crossed out this entry. Ochei has noted that Newman erred in crossing out the entry and was disciplined.

[**7] Ochei's job performance was observed and evaluated on December 4, 1998; December 18, 1998; December 21 and 22, 1998; and February 3, 1999.

The evaluations of Ochei and associated memorandums collectively indicate that she failed to correctly transcribe MAR/Medex orders, obtain and secure controlled drugs needed on her medications cart, carry medicine keys, introduce herself to and properly identify patients, take vital signs and observe patients for infections, read and compare Medex labels, accurately pour out medication, read labels a third time, administer medication in a timely fashion, document narcotics in the count book, enter controlled medications immediately, wash hands, properly record medication, identify generic names of drugs, and classify medication. Certain categories were marked satisfactory. These evaluations were prepared by four different supervisors.

Early on December 4, 1998, Ochei was informed that she was scheduled to be observed that day. She was observed by Head Nurse Leelamma Cherian ("Cherian") in the A-11 Nursing Facility unit.

[*280] During the December 4 observation, Ochei was observed picking up a tablet that fell on the floor with her fingers and placing [**8] it in the patient's mouth, misidentifying medications, and signing for 9:00 p.m. medication at 1:00 p.m. Ochei has denied that she dropped the tablet and placed it in the patient's mouth.

The December 4 evaluation states that Ochei was not yet safely administering medication and needed further supervision.

Ochei next was observed by Evanette Gonzales ("Gonzalez"), then a Staff Nurse with Performance Improvement Activity Duties, on or about December 18, 1998. As part of her job duties, Gonzales would randomly choose a ward and observe Professional Nurses (including LPNs) in that ward to confirm that nurses assessed pain levels of patients on pain medication while administering medication. Gonzales completed these routine observations on nurses in all wards throughout the hospital to ensure that employees adhered to Patient Care Policy No. 46.

On December 18, 1998, Gonzales issued a memorandum indicating that on December 15 and 18, 1998, Ochei failed to document reassessment of pain, did not assess patients' pain levels, did not sign narcotic sheets, and did not immediately document narcotics administered.

On December 21 and 22, 1998, Ochei was temporarily assigned to the A-54 unit [**9] in order to allow her to be observed by a different nurse. On those days, she was observed by Head Nurse Shirley Castillo. This observation was made so that Ochei would have a second chance to pass this evaluation.

According to Ochei, she did not feel competent to perform as an LPN in December 1998 with respect to the administration of medication.

Ochei was issued two memoranda regarding this evaluation on December 21 and 22, 1998, reminding her of the importance of taking patients' vital signs, observing residents for infections, and immediately entering controlled medications on the appropriate logs.

Ochei was transferred to the A-34 hospital unit on January 7, 1999, in order to allow her to administer medications in a smaller setting and to give her a broader range of medicine.

Ochei received a warning on January 25, 1999, regarding violations of the hospital's policy regarding assessment of pain management and recording controlled medications.

Ochei was counseled by Merlyn Brockett on January 28, 1999. This counseling session concerned her violations of the transcription policy, documentation of controlled substances,

and her responsibility to assess and document pain management [**10] of patients. Ochei was told that her performance would be monitored.

Ochei attended nursing education and observed administration of medication by Hunter Lossey on February 1, 1999, because she was referred to Medication Administration review and evaluation.

Ochei was observed by Staff Nurse Mariam Empalmado ("Empalmado") on February 3, 1999 in the A-34 hospital unit. During this observation, Empalmado noted that Ochei took three hours to administer medications, was unsure of herself, prepared the wrong medication, and almost administered medication in the wrong eye. Ochei did not notice these failures until they were pointed out to her. Her work performance was found to be unsatisfactory. Ochei has disputed these observations and has asserted that the observer rushed her and told her to hurry up.

[*281] Based on the performance evaluations and memoranda issued to Ochei, Stanlee Richards ("Richards"), then an Associate Director of Nursing, decided to limit her duties to patient care and treatment, while precluding her from administering medication. Patient care and treatment are among the duties of an LPN. Richards made this decision based on four separate observations of Ochei by four [**11] different supervisors. Richards did not know Ochei's national origin at the time of this decision and did not consider terminating Ochei as an LPN.

When Ochei was advised on February 9, 1999 of the decision to restrict her activities, she stated that she wanted to resign, and Richards took her to the Director of Nursing, Joan Delande ("Delande"). Richards and Delande encouraged Ochei to reconsider her plan to resign, but she resigned effective the next day.

According to Ochei, she sought reinstatement the next day. The Defendants, who were under no obligation to reinstate Ochei, denied her request by letter dated March 5, 1999.

Defendants argue that they denied Ochei's request based on her performance as an LPN. According to Ochei, the denial was based on her national origin. She has testified that she is not bringing a claim of race discrimination and she did not complain on the basis of race. According to Ochei, she believes that she did not receive adequate training and received negative evaluations "possibly" because she was the only Nigerian LPN.

Ochei testified that she heard her co-workers make negative comments about Nigerians but that she does not recall who made these [**12] alleged comments, when they were made, or how often they were made. Ochei does not recall any of these alleged comments being made by Richards, Cherian, Gonzales, Newman, or Delande, her immediate supervisors and managers. At deposition, Ochei testified that such comments were made more than once, but could not state with certainty that they were made more than five times, because she "didn't keep count" and did not remember. (Soni Decl. Ex. M, at 176-77.)

According to Ochei, her co-workers told her that another Nigerian nurse, Nomyo, underwent a similar experience that she had, but she was unable to provide Nomyo's full name or details about when Nomyo worked at Coler/Goldwater. Richards, who has supervised nurses at Coler/Goldwater for twenty-five years, testified that she does not recall any nurse named Nomyo.

Ochei filed her charge of discrimination with the EEOC on or about March 29, 1999, including complaints that she was discriminated against based on her race, national origin, and in retaliation. Ochei filed the instant federal action on or about May 23, 2000.

**Discussion**

### *I. The Standard For Summary Judgment*

<sup>HN1</sup>Pursuant to Rule 56, summary judgment [**13] may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *SCS Communs., Inc. v. Herrick Co.,* 360 F.3d 329, 338 (2d Cir. 2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[*282] <sup>HN2</sup>Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223-24 (2d Cir. 1994) (internal citations omitted). [**14] If, however, "as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir. 1996)).

<sup>HN3</sup>The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner,* 871 F. Supp. 613 (S.D.N.Y. 1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Thus, "<sup>HN4</sup>summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir. 1993).

<sup>HN5</sup>A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about [**15] a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir. 1997).

### *II. Discrimination On The Basis Of Race Or National Origin Has Not Been Established*

<sup>HN6</sup>In Title VII employment discrimination cases, the plaintiff has the initial burden to establish a *prima facie* case by pointing to evidence in the record demonstrating that she: (1) is a member of a protected class; (2) was performing her job satisfactorily; (3) suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of discrimination. *See McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311-12 (2d Cir. 1997). The Second Circuit has noted that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano,* 116 F.3d 625, 629 n.1 (2d Cir. 1997) (citing *Van Zant v. KLM Royal Dutch Airlines,* 80 F.3d 708, 714-15 & n.6 (2d Cir. 1996)). [**16]

The Second Circuit and New York state courts traditionally have applied the same standards of liability for claims under the CHRL. *See, e.g., Weinstock v. Columbia Univ.,* 224 F.3d 33, 42 n.1 (2d Cir. 2000) ("The identical standards apply to employment discrimination claims

brought under Title VII, Title IX, New York Executive Law § 296, and the Administrative Code of the City of New York."); *Forrest v. Jewish Guild for the Blind*, 309 A.D.2d 546, 765 N.Y.S.2d 326, 332-33 (N.Y. App. Div. 2003) ("[T]he standard for recovery under [the SHRL] is in accord with the federal standards under [Title VII], and the human rights provisions of New York City's Administrative Code mirror the provisions of the Executive Law." (citations omitted)). However, this practice of parallel **[*283]** interpretation has been called into question by the New York City Council's passage of the Local Civil Rights Restoration Act, which amended several provisions of the CHRL and emphasized that the CHRL should be "construed independently from similar or identical provisions of New York state or federal statutes." N.Y.C. Local Law No. 85 of 2005, § 1 (Oct. 3, 2005). The amended **[\*\*17]** code directs that the "provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Admin. Code § 8-130. ¹

**FOOTNOTES**

1 For an extensive analysis of the purposes of the Local Civil Rights Restoration Act, written by one of the Act's principal authors, see Craig Gurian, *A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law*, 33 Fordham Urb. L.J. 255 (2006) (emphasizing the expansive intent of the CHRL and arguing that courts have failed to interpret it independently from Title VII and the SHRL, instead engaging in "rote parallelism").

At least two New York state courts recently have held that the CHRL holds employers to a higher standard than Title VII and the SHRL, and should be "liberally and independently **[\*\*18]** construed." *Jordan v. Bates Adver. Holdings, Inc.*, 11 Misc. 3d 764, 770, 816 N.Y.S.2d 310 (N.Y. Sup. Ct. 2006); *see also Farrugia v. N. Shore Univ. Hosp.*, 2006 N.Y. Misc. LEXIS 2165, No. 102125/03 (RTA), 2006 WL 2337963, at \*\*5-\*\*6 (N.Y. Sup. Ct. June 21, 2006) ("[T]he case law that has developed in interpreting both the [SHRL] and Title VII should merely serve as a base for the [CHRL], not as its ceiling." (quoting *Jordan*, 11 Misc. 3d at 770-71)). Nevertheless, in the absence of "direct evidence of national origin or gender discrimination," the same *McDonnell-Douglas* burden-shifting analysis used in Title VII and SHRL cases applies to claims of discrimination brought under the CHRL. *Farrugia*, 2006 N.Y. Misc. LEXIS 2165, 2006 WL 2337963 at \*\*8; *see also Jordan*, 11 Misc. 3d at 771.

**HN7** If the plaintiff meets the burden of establishing a prima facie case, then the burden of production (although not the burden of proof) shifts to the employer to show that any adverse employment actions were taken for legitimate, non-discriminatory reasons. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). Once Defendants produce such evidence, "[t]he presumption **[\*\*19]** [raised by the prima facie case] . . . simply drops out of the picture." *Id.* at 511. At that point, "the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." *James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000).

Here, Ochei has shown only that she is a member of one or more protected classes. She has not established that she is a qualified LPN or that any adverse actions give rise to an inference of discriminatory treatment. **HN8** "To raise an inference of discriminatory intent, the comments and behaviors [plaintiff objected to] must be linked in some way to plaintiff's protected status. This linkage is typically found in the use of invidious or ethnically degrading comments." *Pimentel v. City of New York*, 2001 U.S. Dist. LEXIS 20426, No. 00 Civ. 0326 (SAS), 2001 U.S. Dist. LEXIS 20426, at \*16 (Dec. 11, 2001).

### A. Qualification As An LPN

**[*284]** In order to establish a *prima facie* case of discrimination, Ochei must establish that she was qualified to perform the duties of an LPN. *See Aksamit v. 772 Park Ave. Corp.,* No. 00 CV 5520 (RCC), 2003 U.S. Dist. LEXIS 17499, (S.D.N.Y. Oct. 2, 2003) **[**20]** (plaintiff must show that she met employer's minimum requirements). *HN9* "Whether job performance [is] satisfactory depends on the employer's criteria for the performance of the job -- not the standards that may seem reasonable to [a] jury or judge." *Thornley v. Penton Publishing,* 104 F.3d 26, 29 (2d Cir. 1997) (plaintiff must establish that she was qualified for the position from which she was discharged by showing that she was satisfactorily performing the job at time). *See also McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir. 1997) (negative evaluations provide legitimate nondiscriminatory reason for termination); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985) (plaintiff must show as part of her prima facie case that she met her employer's legitimate expectations); *Williams v. R.H. Donnelley Inc.,* 199 F. Supp. 2d 172, 177 (S.D.N.Y. 2002) ("In determining whether an employee is qualified under the second prong of the *McDonnell Douglas* analysis, a court must examine the criteria the employer has specified for the position." (internal quotation marks omitted)).

As an LPN, Ochei's duties **[**21]** included: providing nursing care to patients; administering medications and treatments to patients; preparing for and assisting physicians with diagnostic procedures; reinforcing, supporting, and providing health care instructions to patients; and observing and reporting patients' vital signs, symptoms, and general conditions.

Defendants also provided Ochei with detailed procedures for transcription, documentation, and administration of medications in Policy No. 46.

As Defendants have shown, the observations written by numerous different individuals noted that Ochei failed to comply with the HHC policy regarding transcription, administration of medication, and administration of controlled substances. Accordingly, Ochei cannot demonstrate that she was qualified for the position.

### B. Ochei Has Not Established Circumstances Giving Rise To An Inference Of Discrimination

Ochei identified her race as black and national origin as Nigerian. She did not allege that any black employees were treated worse than non-black employees and she did not know of differential treatment towards black nurses in general. Accordingly, the conclusory allegations set forth in the complaint of **[**22]** race discrimination are insufficient to support a finding of race discrimination. *See Khan,* 2003 U.S. Dist. LEXIS 16329, at *19.

Ochei claims that she did not get adequate training, that she was transferred, and that she received negative evaluations "possibly" because she was the only Nigerian LPN. Assuming, *arguendo,* that the quality of Ochei's training, her transfers, and her negative evaluations constitute adverse employment actions, *HN10* a mere possibility, standing alone, is insufficient to support an inference of discrimination based on national origin. *See Hawana v. City of New York,* 230 F. Supp. 2d 518, 527 (S.D.N.Y. 2002) (plaintiff undercuts his discrimination claim by explaining that he "does not know why" he was harassed).

Ochei's national origin discrimination claim boils down to the fact that she was the only Nigerian in the LPN class in October 1998. In the absence of any facts to support the assertions of discrimination, summary judgment is appropriate. *Rodriguez v. Human Res. Admin. for Children's Servs.,* 1998 U.S. Dist. LEXIS 19567, *9-10 (JGK) (S.D.N.Y. **[*285]** Dec. 16, 1998) (granting summary judgment in part because **[**23]** plaintiff's testimony that "'[if] they didn't do it because I am Hispanic, maybe they did it because I am a human being.'" did not rise to the level of "specific allegations" in order to establish a prima facie

case of employment discrimination).

Ochei referred to another former Nigerian employee, Nomyo, who she heard also was "constructively discharged" as a nurse at HHC. This hearsay did not give this person's full name nor has the rumor been verified by Ochei. Richards, who has been a member of the Nursing Department at Coler/Goldwater for over twenty-five years, did not have any knowledge of a former nurse named Nomyo.

Defendants have met their burden by showing the absence of evidence to support necessary elements of a prima facie case of discrimination. Ochei has failed to establish that she was qualified as an LPN or that any adverse employment action she may have suffered took place under circumstances giving rise to an inference of discriminatory animus.

### III. A Hostile Work Environment Has Not Been Established

HN11 To establish a claim for hostile work environment under Title VII and the SHRL, a plaintiff must demonstrate discriminatory conduct that was "sufficiently [**24] severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993) (internal quotation marks omitted); *see also Leopold v. Baccarat, Inc.,* 174 F.3d 261, 267 (2d Cir. 1999). A plaintiff must set forth facts that support both a subjective and an objective belief that her work environment was hostile for discriminatory reasons. *Harris,* 510 U.S. at 21-22. Even if Ochei could show a subjective belief that her work environment was hostile, she must establish *prima facie* evidence that a reasonable person would have concluded that the work environment was hostile. *See id.* To make this showing, a plaintiff must point to evidence in the record indicating that her workplace was "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Howley v. Town of Stratford,* 217 F.3d 141, 153 (2d Cir. 2000) (internal quotation marks and citation omitted). The Second Circuit requires a showing of "a continuous [**25] and repeated pattern of explicit [discriminatory] slurs or a few particularly severe incidents of discrimination." *Pimentel,* 2001 U.S. Dist. LEXIS 20426, at *27-*28.

The only "discriminatory insult" Ochei identified was that she heard that her fellow employees said that Nigerians have criminal tendencies. Ochei does not remember who made these alleged comments, when they were made, or how often they were made. She testified that she never heard Richards or any of her other supervisors make derogatory comments about her Nigerian national origin and she does not recall that these comments were made to her directly. HN12 For discriminatory "comments, slurs and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious [discriminatory] comments." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir. 1997) (internal quotations and citations omitted).

The infrequency of these statements alone are insufficient to support Ochei's hostile work environment claim because "isolated remarks or occasional episodes [*286] of [**26] harassment will not merit relief under Title VII . . . ." *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir. 1998) (internal citation omitted); *see also Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir. 1998) ("stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination . . . [and] such comments without more, cannot get a discrimination suit to a jury").

One New York state court recently held that the CHRL does not require a plaintiff alleging a hostile work environment to meet the *Harris* standard of demonstrating that discriminatory conduct was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. *Farrugia,* 2006 N.Y. Misc. LEXIS 2165, 2006 WL 2337963

at **6-**7 (holding that "such a construct is inconsistent with the City's Human Rights Law. Under the City's law, liability should be determined by the existence of unequal treatment and questions of serverity and frequency reserved for consideration of damages.").

It is unnecessary here to determine whether the *Harris* standard should apply to hostile [**27] work environment claims under the CHRL, because Ochei has failed to allege that any of the discriminatory comments were made by supervisors, or that supervisors knew or should have known about the conduct and failed to prevent it. HN13 An employer is liable under the CHRL for the conduct of non-supervisory employees creating a hostile work environment only where the employer "knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action," N.Y.C. Admin. Code § 8-107(13)(b)(2), or "should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct," N.Y.C. Admin. Code § 8-107(13)(b)(3). As Ochei has failed to allege that her supervisors made the discriminatory comments, were or should have been aware of them, or failed to take remedial action, her hostile work environment claim must be dismissed.

## IV. Constructive Discharge Has Not Been Established

HN14 A plaintiff's claim for constructive discharge requires the plaintiff to prove that her employer deliberately and discriminatorily created work conditions [**28] "so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). Upon that showing, the employee's decision to resign "is assimilated to a formal discharge for remedial purposes." *Id.* A claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir. 1993) (citations and internal quotations omitted) (holding no claim for constructive discharge where employee was dissatisfied with his compensation, assignments, and criticisms of his work, but rank and salary were never reduced); *see also Kader v. Paper Software*, 111 F.3d 337, 339 (2d Cir. 1997); *Martin v. Citibank, N.A.*, 762 F.2d 212, 221 (2d Cir. 1985) (no claim where employee had unpleasant assignments and difficult relationship with supervisor); *Pena v. Brattleboro Retreat*, 702 F.2d 322, 324-26 (2d Cir. 1983) [**29] (no claim where employee was dissatisfied with nature of work assignments and change in [*287] responsibilities but had experienced no loss of pay or change in title); *Flaherty v. Metromail Corp.*, 2001 U.S. Dist. LEXIS 10828, No. 98 Civ. 8611 (NLRB), 2001 U.S. Dist. LEXIS 10828, at *17-*18 (S.D.N.Y. July 31, 2001) (conditions singularly or combined were not so unpleasant that the reasonable person would feel compelled to resign where plaintiff was criticized for being admittedly over budget, had her male supervisor cancel a meeting with her, and an assignment was given to another female employee.), *aff'd in an unreported decision*, 59 Fed. Appx. 352, 2002 U.S. App. LEXIS 14126 (2d Cir. 2002), *cert. denied*, 537 U.S. 1171, 123 S. Ct. 994, 154 L. Ed. 2d 912 (2003).

Ochei has not established that she was constructively discharged because no reasonable juror could conclude that the additional training she was offered constituted intolerable working conditions, and because, as explained above, Ochei has not established that the actions of her supervisors give rise to an inference of discriminatory treatment.

## V. Retaliation Has Not Been Established

HN15 In order to make out a *prima facie* case of [**30] retaliation, a plaintiff must prove that: (1) she engaged in protected activity; (2) defendants were aware of the protected activity; (3) she was subjected to an adverse employment action; and (4) there is a causal

connection between the protected activity and the adverse employment action. *Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir. 1996). Failure to satisfy all prongs necessitates dismissal of the claim.

Ochei has claimed that she was retaliated against for complaining about observations of her work, and other allegedly adverse actions. However, because she does not allege that she ever complained to her supervisors that she was the victim of discrimination, these complaints are not protected activity as a matter of law. *See Reed,* 95 F.3d at 1178 (plaintiff failed to establish a prima facie case of retaliation because the alleged complaint was not a protected activity, plaintiff must show "opposition to an unlawful employment practice"; *Bobrowsky v. New York City Bd. of Educ.,* 1999 U.S. Dist. LEXIS 14528, 18-19 (FB) (E.D.N.Y. Sept. 16, 1999) (grievances seeking a different position and credit for a day's work [**31] do not constitute protected activity), *aff'd in unreported opinion,* 2000 U.S. App. LEXIS 9978 (2d Cir. May 12, 2000).

Even if Ochei had made complaints to her supervisors constituting protected activity, she has presented no evidence to show a causal connection between such activity and the decision not to reinstate her. *HN16* A plaintiff cannot simply allege a causal connection; rather, she must point to admissible facts upon which a jury could find a causal connection between the protected activity and adverse action. *See Edwards v. Interboro Institute,* 840 F. Supp. 222, 229 (E.D.N.Y. 1994).

The only protected activity Ochei can point to is her filing a complaint with the Equal Employment Opportunity Commission ("EEOC") on March 29, 1999. However, Ochei cannot establish a retaliation claim based on her filing an EEOC complaint and any alleged adverse employment action because she filed her EEOC charge on March 29, 1999, whereas the last alleged adverse employment action, denial of reinstatement, took place on March 5, 1999. *Jetter v. Knothe Corp.,* 324 F.3d 73, 77 (2d Cir. 2003) (citing *Slattery v. Swiss Reins. America Corp.,* 248 F.3d 87, 95 (2d Cir. 2001). [**32]

### VI. Coler/Goldwater Is Not A Suable Entity

The action also must be dismissed as to Coler/Goldwater on the ground that [*288] it is not a suable entity. As a facility owned and operated by HHC, Coler/Goldwater may not be sued in its independent capacity. *See* N.Y. Unconsol. Laws Ch. 214-A, § 5 (McKinney's 1969); New York City Charter § 396; *Ayala v. Bellevue Hosp.,* 1999 U.S. Dist. LEXIS 12982, No. 94 Civ. 1551 (WHP), 1999 U.S. Dist. LEXIS 12982, at *9 (S.D.N.Y. Aug. 20, 1999) ("since Bellevue is merely a facility within HHC, it too lacks the capacity to be sued").

### Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted and the complaint dismissed.

Submit judgment on notice.

**New York, NY**

**August 31, 2006**

**ROBERT W. SWEET**

**U.S.D.J.**