*2006 NY Slip Op 26344, \*; 13 Misc. 3d 740, \*\*;*
*820 N.Y.S.2d 718, \*\*\*; 2006 N.Y. Misc. LEXIS 2277*

**[\*1]** Thomas Farrugia, Plaintiff, against North Shore University Hospital, Defendant.

102125/03

SUPREME COURT OF NEW YORK, NEW YORK COUNTY

2006 NY Slip Op 26344; 13 Misc. 3d 740; 820 N.Y.S.2d 718; 2006 N.Y. Misc. LEXIS 2277

June 21, 2006, Decided

**NOTICE:**

THE LEXIS PAGINATION OF THIS DOCUMENT IS SUBJECT TO CHANGE PENDING THE RELEASE OF THE FINAL PUBLISHED VERSION. THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE PRINTED OFFICIAL REPORTS.

**PRIOR HISTORY:** Farrugia v. North Shore Univ. Hosp., 2006 N.Y. Misc. LEXIS 2165 (N.Y. Sup. Ct., June 21, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employer filed a motion for summary judgment dismissing a six-count complaint filed by plaintiff former employee that alleged sexual harassment, gender and national origin discrimination, and retaliation in violation of the New York State Human Rights Law and the New York City Human Rights Law. The employee had annulled his previous election to pursue an administrative remedy under the State Law.

**OVERVIEW:** The employee, who worked as a lab technologist for the employer from 1993 to 2000, alleged that most of the other lab technologists were female and of another race and national origin. He claimed that in 1995 and 1996 a female lab technologist made inappropriate sexual remarks and gestures which ceased after he told a superior. After his shift was changed in January, 2000, two female lab technologists allegedly made more inappropriate gestures and remarks. He alleged that he was terminated in retaliation for complaining. The court denied the summary judgment motion as to the employee's harassment complaints made after the shift change. The motion was otherwise granted. The employee alleged sufficient facts to make out a claim of sexual harassment, but the conduct in 1995 and 1996 was not continuing discrimination because it stopped after he told a superior. Claims related to conduct predating the shift change were therefore time-barred. The evidence did not support the employee's gender and national-origin discrimination claims, and he raised no triable issues of fact on either claim. Other warnings and disciplinary issues prevented a showing that his termination was a retaliation.

**OUTCOME:** The court denied the motion for summary judgment dismissing the employee's claims of sexual harassment postdating January, 2000. As to his claims of sexual harassment before that date, discrimination on the basis of gender and national origin, and retaliation, the motion for summary judgment dismissing the claims was granted.

**CORE TERMS:** sexual harassment, lab, summary judgment, national origin, causes of action, technologist, sex, Restoration Act, local law, harassment, laintiff, sexual, discrimination claims, statute of limitations, issues of fact, retaliation, gender, bag, administrative process, hostile work environment, civil rights, prima facie case, discriminated, termination, entitlement, admissible, terminated, offensive, proponent, sexually

## LEXISNEXIS(R) HEADNOTES

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Civil Enforcement Actions
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Statutes of Limitations

*HN1* While a complainant may annul his election to the administrative process at the New York State Division of Human Rights prior to a hearing and then proceed to court, Executive Law § 297(9), if such an annulment is made, any judicial proceedings are subject to New York's general three-year statute of limitations, measured from the occurrence of the discrimination, with no tolling for the period in which the claim was pending in the administrative process. Executive Law § 297 (9). The three-year statute of limitations, however, will not prevent the court from going beyond the limitations period in hostile environment claims if the conduct is of a continuous nature.

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment
Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Statutes of Limitations

*HN2* A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice. A timely filing provision only requires that a plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of a statute of limitations, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability. Acts occurring outside a statutory limitations period that have no relation to the acts within the statutory period, or for some other reason, such as certain intervening actions by the employer, are no longer part of the same hostile environment claim, and then the employee cannot recover for the previous acts.

Governments > Legislation > Interpretation
Labor & Employment Law > Discrimination > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN3* The New York City Human Rights Law (City Law) is to be liberally and independently construed with the aim of making it the most progressive in the nation. Thus, the case law that has developed in interpreting both the New York State Human Rights Law and Title VII should merely serve as a base for the City Law, not its ceiling.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Employee Burdens

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Burdens of Proof > Severe & Pervasive Standards

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Coverage & Definitions > Sexual Harassment

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Federal & State Interrelationships

*HN4* To establish a claim of sexual harassment under the New York City Human Rights Law (City Law), a plaintiff must show that (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome sexual harassment; and, (3) the harassment complained of was based upon his or her sex. Although under Title VII and the New York State Human Rights Law, the federal and New York State counterparts, a plaintiff must also show that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, such a construct is inconsistent with the City Law. Under the City Law, liability should be determined by the existence of unequal treatment and questions of severity and frequency reserved for consideration of damages.

Governments > Legislation > Interpretation
Labor & Employment Law > Discrimination > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN5* See New York City, N.Y., Loc. Laws No. 85, § 1.

Governments > Legislation > Interpretation
Labor & Employment Law > Discrimination > General Overview
Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview

*HN6* The Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), requires that provisions of the New York City Human Rights Law (City Law) are to be construed liberally to accomplish the uniquely broad and remedial purposes of the local law, regardless of whether federal human rights law or the New York State Human Rights Law, including those laws with provisions comparably-worded to provisions of the City Law, have been so construed. New York City, N.Y., Loc. Laws No. 85, § 13 (2005), amending New York City, N.Y., Admin. Code § 8-130. The existing case law should be used only as an aid in interpreting the City Law in one of two ways: First, as a floor below which the City Law cannot fall, rather than a ceiling above which the local law cannot rise, New York City, N.Y., Loc. Laws No. 85, § 1 (2005); and second, to find the construction that best accomplishes the City Law's purposes.

Labor & Employment Law > Discrimination > Harassment > Sexual Harassment > Hostile Work Environment

*HN7* Whether an environment is hostile or abusive can be determined only by looking at all the circumstances. These factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

Labor & Employment Law > Discrimination > General Overview

*HN8* Under both the New York State Human Rights Law and the New York City Human Rights Law, an employer is liable for the discriminatory conduct of a non-management employee or agent if it knew or should have known of the conduct

make out a prima facie case by demonstrating that he is a member of a protected class and was discharged or barred from a position for which he was qualified, or paid less in such position, and that this occurred under circumstances giving rise to an inference of discrimination. All that is required at this juncture is a de minimus showing.

Evidence > Inferences & Presumptions > Presumptions
Evidence > Inferences & Presumptions > Rebuttal of Presumptions
Labor & Employment Law > Discrimination > Gender & Sex Discrimination > Proof > Burdens of Proof > Burden Shifting
Labor & Employment Law > Discrimination > National Origin Discrimination > Proof > Burden Shifting

HN14± Once a prima facie case of national origin or gender discrimination has been established against an employer, a presumption arises that the employer unlawfully discriminated against the plaintiff. To rebut the presumption, the employer must submit evidence of legitimate, nondiscriminatory reasons for its adverse actions toward plaintiff. If evidence rebuts the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's reason was false and that discrimination was the real reason. The fact finder's disbelief of the reasons put forward by the defendant, particularly if disbelief is accompanied by suspicion of mendacity, may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination.

Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview
Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

HN15± To establish a retaliation claim, a plaintiff must make out a prima facie case that: (1) he or she participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) that a causal connection exists between the protected activity and the adverse employment action. Unlike the federal standard which requires that the manifestations of retaliation be material, under the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(7) (1989) (amended 1991) makes it clear that it is illegal to retaliate in any manner.

Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview
Labor & Employment Law > Discrimination > Retaliation > Remedies > Damages
Labor & Employment Law > Discrimination > Retaliation > Statutory Application > Title VII of the Civil Rights Act of 1964 > General Overview

HN16± Concerned with courts applying the federal materiality standard to the New York City Human Rights Law in retaliation claims, the Local Civil Rights Restoration Act of 2005, New York City, N.Y., Loc. Laws No. 85 (2005), seeks to remedy this by adopting the standard set out in guidelines of the Equal Employment Opportunity Commission (EEOC). Under the EEOC guidelines, the degree of harm suffered by an individual goes to the issue of damages, not liability. Equal Emp. Oppt'y Comm'n Compliance Manual §§ 8, 13 (1998).

**COUNSEL:** Thomas Ricotta, Esq., The Law Firm of Luis Ginsberg, P.C., Roslyn, New York, for Plaintiff.

Steven N. Davi, Esq., Farrell Fritz, P.C., Uniondale, New York.

**JUDGES:** Rolando T. Acosta, J.

**OPINION BY:** Rolando T. Acosta

**OPINION**

[**741]  [***720]  Rolando T. Acosta, J.

*Background*

1

---

**FOOTNOTES**

1 This decision has been edited for publication.

---

On February 6, 2003, plaintiff Thomas Farrugia, a white male lab technologist at North Shore University Hospital, filed a complaint alleging sexual harassment, sexual discrimination, and national origin discrimination under both the New York State and New York City Human Rights laws. The crux of his complaint is that he has been sexually harassed by a female lab technologist and that the hospital has refused to do anything about it. He also alleges that the majority of lab technologists and supervisors are Asian-Filipino and that they, with the hospital's consent, have discriminated against him because of his national origin. Given the three year statute of limitations, CPLR § 214(2); 15 NY Exec. L. § 297[9]; N.Y.C. Admin. Code § 8-502[d], [**742] plaintiff's allegations are presented pre- and post-February 6, 2000.

*Pre-February 6, 2000 Allegations*

Plaintiff, was hired by defendant North Shore Hospital on January 11, 1993, as a lab technologist. According to plaintiff, in 1995, another lab technologist, Annabelle Joson, said to plaintiff on consecutive nights, "oh, you look like you just had sex." Plaintiff reported the first incident to Hydie Cheng, the lead technologist on the shift, right away and the second incident shortly thereafter. Cheng allegedly said that she would look into it and Joson never made that comment to him again. In 1996, Joson also allegedly pulled the elastic on her pants down and said "you should see what is underneath." Plaintiff did not report this incident to anyone. Also, in two separate incidents in 1996, Joson allegedly exposed her buttocks to plaintiff, and he complained to Cheng. In addition, in February 1996, plaintiff observed Joson rubbed her breast against another woman and then motioned to plaintiff as if to say, "we can have any man that we want."

In January 2000, plaintiff was transferred to the 4 p.m. to 12 a.m. shift. During this time, Joson allegedly commented on plaintiff's appearance, at times looking at him up and down, saying that he "looked good" and "you are such a good dresser." On one occasion, she said, [*2] "Look, you have a receding forehead" and "what does it feel like to have a receding forehead." Plaintiff asked her to leave him alone, but she allegedly persisted and would call him "selfish and cold-hearted." She would also tell other workers that plaintiff did not like women. Joson would engage in conversation with her co-workers in a language that plaintiff did not understand, but his name would be referenced in the middle of the conversation. According to plaintiff, Joson would subject him to these comments three to four times a week. At one time, Plaintiff told Joson that he had a medical condition with his veins in his

scrotum, and she referred to him as a "broken arrow."

*Post-February 6, 2000 Allegations*

In addition to the alleged inappropriate comments by Joson being made three to four time a week, in late May or early June 2000, Joson rubbed plaintiff's waist with her arm as he was holding a blood **[\*\*\*721]** sample in his hands, while she made a gesture as if she were holding his genitals. Plaintiff told her to get her hands off and allegedly reported the incident to Cheng, who told him that Josen simply had a crush on him.

**[\*\*743]** During this time period, Joicie Garcia, another lab technologist, bent over and simulated a sex act when plaintiff asked her "what have you been up to[?]" Plaintiff did not report this incident.

*Plaintiff's Performance Evaluation*

On June 8, 2000, plaintiff was evaluated by Joyceann Musel-Winn, Administrative Director of the Laboratory Department. Although plaintiff's overall score was a 3 ("Meets Standards - that behavior which consistently meets the expected performance level with minimal errors") on a scale of 1 to 5 (32 categories), he received a total of six scores of "Needs some improvement" and one "Does not meet standard" for his inability to get along with his co-workers. He also received an "unsatisfactory" for attendance given his 20 absences and 31 instances of tardiness for the year. Musel-Winn nonetheless marked the "Retain employee in present position" recommendation.

According to Musel-Winn, plaintiff became upset about his low scores and stated that "[t]his is par for a lab with its staffing, with all the females in the lab" and that he had told her about it before. Musel-Winn responded that she did not recall having any conversations with him about the women in the lab, to which he stated, according to Musel-Winn, for the first time that he was "tired of the sexual harassment in the laboratory, all the innuendos that go on in the laboratory concerning" him because he was the only male on the evening shift. He also allegedly told her that "that woman, she is always after me. She is always looking at me and laughing. She must like me and I don't want to deal with her. Tell her to stop." According to Musel-Winn, plaintiff did not identify the person allegedly harassing him.

When Musel-Winn asked Cheng about plaintiff's allegations, Cheng denied that she had engaged in any inappropriate behavior and stated that she did everything possible to stay away from plaintiff because he was dangerous. In support of her concern, she stated that plaintiff brought a hammer and a knife to work in a bag and made a point of banging the bag on the tables in the lab when he was angry. In fact, plaintiff admitted that he started bringing a hammer and knife to work during a strike in 1996 because he feared for his life. Musel-Winn also spoke with other lab employees who denied any sexual harassment or that they saw any one harass plaintiff.

**[\*3]** Musel-Winn also stated that on June 15, 2000 plaintiff was visibly upset and pacing back and forth while muttering about **[\*\*744]** Joson. He complained to Musel-Winn that Joson had on shorts underneath her lab coat. Musel-Winn looked into it and determined that Joson had on a skirt. She nonetheless asked both plaintiff and Joson to come into her office. When they came in, according to Musel-Winn, plaintiff for the first time alleged that he had been sexually harassed by Joson. Plaintiff told her that Joson tried to impress him by pulling down her underwear, made sexual remarks concerning his sexual organ, including remarking about the size of his penis, and stared at his crotch. At his deposition, however, plaintiff stated that he told Musel-Winn about Joson's conduct at the June 8 evaluation. Plaintiff's Deposition at 133. When asked whether that was the first time that he complained about Joson's behavior, he stated "I believe I told her in the past as well." *Id.*

[***722] Joson denied plaintiff's allegations, and like Cheng, stated that she was afraid of plaintiff because he hit the lab walls with his fist when he was angry, carried a hammer in his bag, and banged his bag on the tables when he was angry so that it was obvious that he had a hammer in his bag. According to Musel-Winn, her investigation revealed that it was plaintiff who was interested in Joson. She also spoke with Joycie Garcia who denied plaintiff's allegation about her. Garcia told Musel-Winn that plaintiff was interested in Joson and had talked to Garcia about Joson's "pretty legs" and that he wanted to have sex with Joson.

On June 16, 2000, the day after plaintiff complained to Musel-Winn about Joson, plaintiff spilled a urine sample on Joson. According to Musel-Winn the circumstances suggested that it was intentional and she reported the incident in a hospital safety committee meeting. About one month later, Garcia sent Musel-Winn a letter detailing plaintiff's sexually harassing behavior towards both she and Joson. Joson also reported to Musel-Winn that after Garcia had rebuffed plaintiff's sexual advances, he approached Joson and asked her whether Garcia was dating an "Indian doctor" and whether they "have big penises."

*Plaintiff's Termination*

According to Musel-Winn, plaintiff had a history of behavioral and performance problems. He had been warned about his attendance problems in his 1994, 1996, 1998, and 2000 performance evaluations. Indeed, on December 30, 1999, he received a disciplinary warning because he failed to show up for his shift, called and said that he had overslept, and then never reported for duty that night. On February 14, 2000, he was disciplined [**745] for insubordination for "scratching out" his weekend shift from the schedule. Musel-Winn warned him that he could not alter hospital records and told him that she expected him to work on his assigned shifts. Despite the warning, he called in sick on the days he had scratched off.

He also, according to Musel-Winn, repeatedly failed to follow critical lab protocol. For instance, in 1999, he made four critical errors, including botching up a pregnancy test, filed a false negative, and after he determined that the test was positive, failed to notify the emergency room that he changed the results. He had also been warned about not documenting critical value calls (test results that must be reported immediately) on July 22, 1999, August 8, 1999, March 10, 2000, and July 6, 2000.

On July 17 and August 3, 2000, plaintiff committed two "critical" errors in the lab by not following hospital protocol. As a result of his errors, he filed lab results, which had not been properly verified and on which hospital staff could have relied in making treatment decisions. According to Musel-Winn, given his past behavioral and performance issues, she decided to [*4] terminate him.

*Plaintiff's Complaint*

On November 14, 2000, plaintiff filed a complaint with the New York State Division of Human Rights, alleging that he was discriminated against due to his "race/color" and "national origin," and "retaliated against . . . because he complained of discrimination." Plaintiff subsequently annulled his election of the administrative process prior to a hearing and filed a complaint in Supreme Court. His complaint alleges six causes of action. The first two, allege that defendant violated the New York State Human Rights Law (first) and New York City Human Rights Law (second) "by sexually harassing [p]laintiff, discriminating against him because of his sex and firing [p]laintiff in response to his [***723] complaints about harassment." The third and fourth alleged that defendant violated the New York City Human Rights Law (third) and the New York State Human Rights Law (fourth) "by harassing [p] laintiff based on his American national origin, and firing [p]laintiff in retaliation for his complaints." Last, the fifth and sixth allege that defendant violated the New York State Human Rights Law (fifth) and New York City Human Rights Law (sixth) "by firing [p]laintiff because of his complaints about sexual harassment and national origin discrimination."

[**746] *Analysis*

HN1 While a complainant may annul his election to the administrative process at the NYSDHR prior to a hearing and then proceed to court (Executive Law § 297 [9]; *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75-76 [2d Cir. 2000]; *Legg v. Eastman Kodak Co.*, 248 A.D.2d 936, 937, 670 N.Y.S.2d 291 [4th Dept 1998]), if such annulment is made, any judicial proceedings are subject to New York's general three-year statute of limitations, measured from the occurrence of the discrimination, with no tolling for the period in which the claim was pending in the administrative process. (Executive Law § 297 [9]; *Henderson v. Town of Van Buren*, 15 AD3d 980, 789 N.Y.S.2d 355 [4th Dept 2005]; *Sprott v. New York City Hous. Auth.*, 1999 WL 1206678, 1999 U.S. Dist. LEXIS 19224 [SD NY 1999].) The three-year statute of limitations, however, will not prevent the court from going beyond the limitations period in hostile environment claims if the conduct is of a continuous nature. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); *Hernandez v. Kellwood Co.*, 2003 U.S. Dist. LEXIS 17862, 2003 W.L. 22309326 (S.D.NY 2003)(continuing violation analysis applied to federal discrimination claims under New York City Human Rights Law); *Hughes v. United Parcel Service, Inc.*, 4 Misc 3d 1023(A), 798 N.Y.S.2d 344 (Sup. Ct., NY Co. 2004). As the Supreme Court in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. at 117 held:

> HN2 A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." The timely filing provision only requires that a . . . plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

The Supreme Court, however, held that acts occurring outside the statutory period that "had no relation to the acts [within the statutory period], or for some other reason, *such as certain intervening action by the employer*, were no longer part of the same hostile environment claim, [*5] then the employee cannot recover for the previous acts." *Id.* at 119 (emphasis added).

[**747] Here, plaintiff annulled his election to pursue the administrative process pursuant to the State Human Rights Law and filed a complaint in the Supreme Court on February 6, 2003. Given the three-year statute of limitations, only conduct occurring on February 6, 2000 or later can be used to support his claim of discrimination, unless the continuing doctrine applies. As discussed below, this Court finds that the continuing discrimination doctrine applies only to the alleged sexual harassment conduct attributed to Joson as of January [***724] 2000 (i.e., when plaintiff was transferred to the 4 to 12 shift).

*Sexual Harassment Hostile Work Environment*

The New York City Human Rights Law was intended to be more protective than the state and federal counterpart. As this Court recently stated in *Jordan v. Bates Advertising, Inc.*, 11 Misc 3d 764, 816 N.Y.S.2d 310 (Sup Ct., NY Co. 2006), "in enacting the more protective Human Rights Law, the New York City Council has exercised a clear policy choice which this Court is bound to honor. The Administrative Code's legislative history clearly contemplates that HN3 the New York City Human Rights Law be liberally and independently construed with the aim of making it the most progressive in the nation. [2] Thus, the case law that has developed in interpreting both the State Human Rights Law and Title VII should merely serve as a base for the New York City Human Rights Law, not its ceiling. *See also* Section 1, Local Law 85 ("Local

Civil Rights Restoration **[*6]** Act of 2005); The Council Report of the **[**748]** Governmental Affairs Division, Committee on General Welfare, August 17, 2005." ³

**HN4**⬆To establish a claim of sexual harassment under the N.Y.C. Human rights Law, plaintiff must show that (1) he belongs to a protected group; (2) he was subjected to unwelcome sexual harassment; and, (3) the harassment complained of was based upon his sex. Although under the Federal and New York State counterparts plaintiff must also show that the harassment was sufficiently severe or pervasive to alter the conditions of employment **[***725]** and create an abusive working environment, see, e.g. Harris v. Forklift Sys. Inc., 510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993); ⁴ Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2nd Cir. 1995); Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1042 (2nd Cir. 1993), see also Judith Johnson, License to Harass Women, 62 Md. L. Rev. 85 (2003), such a construct is inconsistent with the City's Human Rights Law. Under the City's law, liability should be determined by the existence of unequal treatment and questions **[**749]** of severity and frequency reserved for consideration of damages. Return to Eyes on the Prize at 297-303.

## FOOTNOTES

**2** Remarks by former Mayor David N. Dinkins at a public hearing on Local Laws, June 18, 1991, 1-2 (on file with Committee on General Welfare). As former Mayor Dinkins noted, it was "the intention of the Council that judges interpreting the City's Human Rights Law . . . not to be bound by restrictive state and federal rulings and are to take seriously the requirement that this law be liberally and independently construed." Id. at 1; see also **HN5**⬆Section 1, Local Law 85 ("Local Civil Rights Restoration Act of 2005), which states in relevant part: It is the sense of the Council that New York City's Human Rights Law has been construed too narrowly to ensure protection of the civil rights of all persons covered by the law. In particular, through passage of this local law, the Council seeks to underscore that the provisions of New York City's Human Rights Law are to be construed independently from similar or identical provisions of New York state of federal statutes. Interpretations of New York State or federal statutes with similar wording may be used as an aid in interpretation of New York City Human Rights Law, viewing similarly worded provisions of federal and state civil rights laws as a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise.

**3** Indeed, Professor Craig Gurian, the principle drafter of the Local Civil Rights Restoration Act in 1991, argues that the courts' unwillingness to apply a more liberal standard in construing the City's Human Rights Law led to the passage of the The Restoration Act in 2005, N.Y.C. Local Law No. 85 (Oct. 3, 2005). Craig Gurian, A Return to Eyes on the Prize: Litigating Under the Restored New York City Human Rights Law, 33 Fordham Urb. L.J. 255 (2006). According to Gurian, **HN6**⬆"The Restoration Act requires that provisions of the City's Human Rights Law hereafter be construed liberally to accomplish the "uniquely broad and remedial' purposes of the local law, regardless of whether federal or New York State . . . Human Rights Law, including those laws with provisions comparably-worded to provisions of this title, have been so construed.'" (quoting the Restoration Act at 13, amending N.Y.C. Admin Code § 8-130). The existing case law should be used only as an aid in interpreting the City Human Rights Law in one of two ways: the First, "as a floor below which the City Human Rights Law cannot fall, rather than a ceiling above which the local law cannot rise." Id. at 278, quoting The Restoration Act at § 1; and, the second "to find the construction that best accomplishes the law's purposes." Id at 279.

**4** In Harris, the Supreme Court stated that **HN7**⬆"whether an environment is hostile' or abusive' can be determined only by looking at all the circumstances. These factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." 510 U.S. at 23.

*HN8*Under both the State and the City's Human Rights Law, an employer is liable for the conduct of a non-management employee or agent if it knew or should have known of the conduct and failed to prevent it. *Priore v. New York Yankees*, 307 A.D.2d 67, 761 N.Y.S.2d 608 (1st Dept. 2003); N.Y.C. **[*7]** Admin. Code § 8-107(13)(a), (b).

It is well settled that *HN9*the proponent of a motion for summary judgment must establish that "there is no defense to the cause of action or that the cause of action or defense has no merit," (C.P.L.R. § 3212[b]), sufficiently to warrant the court as a matter of law to direct judgment in his or her favor. *Bush v. St. Clare's Hospital*, 82 N.Y.2d 738, 739, 621 N.E.2d 691, 602 N.Y.S.2d 324 (1993); *Winegrad v. New York University Medical Center*, 64 N.Y.2d 851, 853, 476 N.E.2d 642, 487 N.Y.S.2d 316 (1985). This standard requires that the proponent of the motion "tender[] sufficient evidence to eliminate any material issues of fact from the case," *id.*, "by evidentiary proof in admissible form." *Zuckerman v. City of New York*, 49 N.Y.2d 557, 562, 404 N.E.2d 718, 427 N.Y.S.2d 595 (1980). Thus, the motion must be supported "by affidavit [from a person having knowledge of the facts], by a copy of the pleadings and by other available proof, such as depositions." C.P.L.R. § 3212(b).

*HN10*Where the proponent of the motion makes a *prima facie* showing of entitlement to summary judgment, the burden shifts to the party opposing the motion to demonstrate by admissible evidence the existence of a factual issue requiring a trial of the action, or to tender an acceptable excuse for his or her failure to do so. *Vermette v. Kenworth Truck Company*, 68 N.Y.2d 714, 717, 497 N.E.2d 680, 506 N.Y.S.2d 313 (1986); *Zuckerman v. City of New York*, *supra*, 49 N.Y.2d at 560, 562. *HN11*Like the proponent of the motion, the party opposing the motion must set forth evidentiary proof in admissible form in support of his or her claim that material triable issues of fact exist. *Id.* at 562.

Here, viewing the facts in the light most favorable to plaintiff, *Kesselman v. Lever House Restaurant*, 29 A.D.3d 302, 816 N.Y.S.2d 13, 2006 WL 1147258 (1st Dept. 2006), plaintiff has certainly alleged sufficient facts, especially those attributed to Joson, to make out a claim of sexual harassment. Moreover, defendant asserts that he told Cheng, the lead technologist, that Joson had rubbed her arm against plaintiff's waist, and she failed to take any action. Defendant has thus failed to establish entitlement to summary judgment dismissing **[***726]** plaintiff's sexual harassment claims. Indeed, the conduct alleged **[**750]** in this case satisfies even the State standard, which requires a showing that the harassment was severe and pervasive. Even if defendant had established its *prima facie* right to summary judgment, the Court nevertheless finds triable issues of fact on this claim. *Gallagher v. Delaney*, 139 F.3d 338, 342 (2nd Cir. 1998)(*HN12*"while gender relations in the workplace are rapidly evolving, and views of what is appropriate behavior are diverse and shifting, a jury made up of a cross-section of our heterogenous communities provides the appropriate institution for deciding whether borderline situations should be characterized as sexual harassment").

The more difficult issue here is whether plaintiff may rely on Joson's alleged conduct that predates February 6, 2000. According to plaintiff, Joson began her offensive conduct as early as 1995, but that conduct stopped in 1996. According to plaintiff, he complained to Cheng when Joson told him that "he looked like he had just had sex," and the conduct ceased. The offensive conduct, according to plaintiff, did not start up again until sometime in January 2000, when he was transferred to a new shift. Then, Joson allegedly made offensive remarks on average of three to for times a week. The January 2000 acts are sufficiently similar and frequent to justify a conclusion that they are part of a single discriminatory practice chargeable to the employer.

The 1996 and earlier remarks attributed to Joson, however, do not satisfy the continuing discrimination doctrine because it cannot be said that defendant allowed the earlier comments to continue unremedied. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. at 119. Indeed, **[*8]** plaintiff complained to Cheng and the conduct ceased in 1996. Accordingly, defendant's motion for summary judgment dismissing the sexual harassment hostile work environment causes of action is granted solely to the extent of precluding plaintiff from using pre-January 2000 allegations to support its claim at trial.

*National Origin and Gender Discrimination Claims*

**HN13**In the absence of direct evidence of national origin or gender discrimination, claims are evaluated pursuant to the burden shifting framework outlined by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Terry v. Ashcroft*, 336 F.3d 128, 138 (2nd Cir. 2003). Thus, a party making such a claim must first make out a *prima facie* case by demonstrating that he is a member of a protected class **[**751]** and was discharged or barred from a position for which he was qualified, or paid less in such position, and that this occurred under circumstances giving rise to an inference of discrimination. *Id* . at 802. All that is required at this juncture is a *de minimus* showing. *Howley v. Town of Stratford*, 217 F.3d 141, 150 (2nd Cir. 2000).

**HN14**Once a *prima facie* case has been established, a presumption arises that the employer unlawfully discriminated against the plaintiff. *Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 254-56, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981). To rebut the presumption, the employer must submit evidence of legitimate, non-discriminatory reasons for its adverse actions toward plaintiff. *Id.*; *Stratton v. Dept. for the Aging*, 132 F.3d 869 (2nd Cir. 1997). If evidence rebuts the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's reason was false and that discrimination was the real reason. *Stephenson v. Hotel Employees* **[***727]** *and Restaurant Employees Union Local 100 of the AFL-CIO*, 14 A.D.3d 325, 331, 787 N.Y.S.2d 289 (1st Dept. 2005), *citing Ferrante v. American Lung Ass'n*, 90 N.Y.2d 623, 630, 687 N.E.2d 1308, 665 N.Y.S.2d 25 (1997). "The fact finder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1978).

Here, defendant has established its entitlement to summary judgment dismissing the gender discrimination claim inasmuch as there is no indication in the record that plaintiff was discriminated against because of his gender. The burden thus shifted to plaintiff to raise triable issues of fact, which he has failed to do.

Defendant has also established its entitlement to summary judgment dismissing the national origin discrimination claim. Plaintiff grounds this claim on three arguments: that his shift was taken from him in 1994 and given to a Filipino; that overtime was assigned disproportionately to Filipino coworkers; and that he was not given the benefit of defendant's progressive discipline plan. The 1994 shift change, however, is time barred under the three-year statute of limitations. **[**752]** With respect to the overtime issue, there is no evidence in admissible form to support plaintiff's allegation. Although he attached Joson's records showing the amount of overtime she received, there is no evidence that this amount is greater than what any one else received. Plaintiff also attempts to supports his claim with inadmissible hearsay evidence. Last, plaintiff's claim that defendant did not employ its progressive disciplinary procedure is not supported by the facts. Instead, the record shows that the collective bargaining agreement provides that defendant "shall have the right to discharge, suspend, or discipline any [e]mployee **[*9]** for cause." Defendant's Exhibit I. In any event, the record shows that plaintiff received both verbal and written warnings as well

as suspension before he was terminated. *See* Defendant's Exhibit H. Plaintiff's failure to raise triable issues of fact related to national origin discrimination necessitates the dismissal of this cause of action as well.

*Retaliation Claims*

HN15 To establish a retaliation claim, a plaintiff must make out a *prima facie* case that: (1) he participated in a protected activity known to the defendant; (2) the defendant took an employment action that disadvantaged the plaintiff; and (3) that a causal connection exist between the protected activity and the adverse employment action. *Terry v Ashcroft, supra,* 336 F.3d at 141; *McMenemy v. City of Rochester,* 241 F.3d 279, 282-83 n. 1; *Holt v. KMI-Continental, Inc.,* 95 F.3d 123 (2nd Cir. 1996). Unlike the federal standard which requires that the manifestations of retaliation be material, under the City's Human Rights Law, the 1991 Amendment made it clear that it was illegal to retaliate "in any manner." *Return to Eyes on the Prize* at 321, *citing* N.Y.C. Admin. Code tit. 8 (1991), § 1, amending N.Y.C. Admin. Code § 8-107(7) (1989). 5

---

**FOOTNOTES**

5 Indeed, HN16 concerned with courts applying the federal materiality standard, The Restoration Act sought to remedy this by adopting the standard set out in guidelines of the Equal Employment Opportunity Commission (EEOC). *Return to Eyes on the Prize* at 320, *citing* the 2005 Comm. on Gen. Welfare, Report on Prop. Int. No. 22-A (Aug. 17, 2005) at 3. Under the EEOC guidelines, the " degree of harm suffered by the individual goes to the issue of damages, not liability.'" *Return to Eyes on the Prize* at 320, *citing* 2 EEOC Complaint Manual § 8, 13 (1998).

---

**[\*\*\*728]** Here, plaintiff claims that all three prongs were satisfied because he received an evaluation in June 2000, which stated that he should be retained. Second, two months later, he was **[\*\*753]** terminated for infractions that predated his evaluation. Third, a rational jury could conclude that a casual connection existed between plaintiff's complaints of sexual harassment to Musel-Winn (the protected activity) and his termination (the adverse employment action). The problem with this argument is that although plaintiff received a "retain employee" evaluation, Musel-Winn had indicated in the evaluation several categories which needed improvement. Moreover, as demonstrated by Defendant's Exhibit H, plaintiff had receive many warnings prior to his termination. Third, defendant conducted an investigation into plaintiff's claims of sexual harassment by questioning the relevant parties. It should be noted that the day after Garcia complained about plaintiff, plaintiff spilled a urine sample on her under circumstances indicating that it was intentional. Thus, plaintiff cannot show that defendant terminated him because of his complaints. *Taylor v. Polygram Records,* 1999 U.S. Dist. LEXIS 2583, 1999 WL 124456, at 22 (S.D.NY 1999) ("given that [plaintiff's] position was already demonstrably at risk before she . . . filed the charge [p]laintiff cannot show on the basis of temporal proximity alone that her termination resulted from that conduct"); *Padob v. Entex Info. Serv.,* 960 F. Supp. 806, 814 (S.D.NY 1997)(finding that plaintiff was terminated three months after filing an EEOC charge did not establish causal connections, given that plaintiff had been placed on a "performance improvement plan" before filing the charge.). Moreover, after the evaluation, **[\*10]** plaintiff not only spilled urine on Garcia, but also breached critical hospital testing procedures on two occasions. Thus, the retaliation claims must also be dismissed.

*Conclusion*

For the reasons stated above, it is

ORDERED that defendant's motion for summary judgment dismissing the complaint is GRANTED solely to the extent of dismissing that portion of the first and second causes of action that allege discrimination against plaintiff because of his sex [6] and firing plaintiff in response to his complaints about sexual harassment. Although that portion of the first and second causes of action that allege sexual harassment survive summary judgment, plaintiff may **[\*\*754]** not rely on alleged sexual harassment conduct that predates January 2000 in support of his claims; and it is further

ORDERED that the Third, Fourth, Fifth and Sixth causes of action are also dismissed.

## FOOTNOTES

[6] Although "sex-based discrimination in employment has come to include sexual harassment," *In Re Father Belle Community Center v. New York State Division of Human Rights*, 221 A.D.2d 44, 642 N.Y.S.2d 739 (4th Dept. 1996), only the sexual harassment portion of the sex discrimination alleged in the first and second causes of action survive summary judgment.

Dated: June 21, 2006

Rolando T. Acosta, J.S.C.

Service: **Get by LEXSEE®**
Citation: **820 N.Y.S.2d 718**
View: Full
Date/Time: Friday, November 2, 2007 - 4:24 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
■ - Questioned: Validity questioned by citing refs
▲ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.


**LexisNexis®**    About LexisNexis  |  Terms & Conditions  |  Contact Us
Copyright © 2007 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.